# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WEST PALM BEACH FIREFIGHTERS' PENSION FUND, on behalf of itself and all other similarly-situated Class A stockholders of MOELIS & COMPANY, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2023-0309-JTL |
| MOELIS & COMPANY, | ) ) | |
| Defendant. | ) ) | |

## OPINION ADDRESSING THE VALIDITY OF PROVISIONS IN A STOCKHOLDER AGREEMENT

Date Submitted: October 18, 2023
Date Decided: February 23, 2024

Thomas Curry, Taylor D. Bolton, SAXENA WHITE P.A., Wilmington, Delaware; David Wales, SAXENA WHITE P.A., White Plains, New York; Adam Warden, SAXENA WHITE P.A., Boca Raton, Florida; *Counsel for Plaintiff*.

John P. DiTomo, Miranda N. Gilbert, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; William Savitt, Anitha Reddy, Getzel Berger, Emma S. Stein, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; *Counsel for Defendant*.

**LASTER, V.C.**

What happens when the seemingly irresistible force of market practice meets the traditionally immovable object of statutory law? A court must uphold the law, so the statute prevails.

The immovable statutory object is Section 141(a) of the Delaware General Corporation Law (the "DGCL"). That provision famously states that "the business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation."[1]

Section 141(a) is the source of Delaware's board-centric model of corporate governance. The Delaware Supreme Court has cited Section 141(a) repeatedly as the foundation of its jurisprudence:

- "A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."[2]

- "The bedrock of the General Corporation Law of the State of Delaware is the rule that the business and affairs of a corporation are managed by and under the direction of its board."[3]

---

[1] 8 *Del. C.* § 141(a).

[2] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing Section 141(a)). In *Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del. 2000), the Delaware Supreme Court overruled *Aronson*, *Grimes v. Donald (Grimes II)*, 673 A.2d 1207 (Del. 1996), *Pogostin v. Rice*, 480 A.2d 619 (Del. 1984), and four other precedents to the extent they applied a deferential standard when reviewing trial court decisions addressing motions to dismiss under Rule 23.1. *Brehm*, 746 A.2d at 254. The cases otherwise remain good law. This decision cites *Grimes II*, *Pogostin* and *Aronson*, but does not rely on them for the standard of appellate review. Having described *Brehm*'s relationship to these cases, this decision omits their cumbersome subsequent history when citing them.

[3] *Pogostin*, 480 A.2d at 624 (citing Section 141(a)).

- "The board has a large reservoir of authority upon which to draw. Its duties and responsibilities proceed from the inherent powers conferred by 8 *Del. C.* § 141(a)."[4]

- "The ultimate responsibility for managing the business and affairs of a corporation falls on its board of directors."[5]

- "The General Corporation Law of the State of Delaware . . . and the decisions of this Court have repeatedly recognized the fundamental principle that the management of the business and affairs of a Delaware corporation is entrusted to its directors, who are the duly elected and authorized representatives of the stockholders."[6]

- "One of the most basic tenets of Delaware corporate law is that the board of directors has the ultimate responsibility for managing the business and affairs of a corporation. . . . Section 141(a) . . . confers upon any newly elected board of directors *full* power to manage and direct the business and affairs of a Delaware corporation."[7]

The presence of a stockholder who controls the corporation does not alter the board-centric framework. "[D]irector primacy remains the centerpiece of Delaware law, even when a controlling stockholder is present."[8]

Internal corporate governance arrangements that do not appear in the charter and deprive boards of a significant portion of their authority contravene Section 141(a). The Delaware courts have regularly considered challenges to contractual

---

[4] *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 953 (Del. 1985).

[5] *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 179 (Del. 1986) (citing Section 141(a)).

[6] *Paramount Commc'ns Inc. v. QVC Network Inc.,* 637 A.2d 34, 41–42 (Del. 1994).

[7] *Quickturn Design Sys., Inc. v. Shapiro (Quickturn II),* 721 A.2d 1281, 1291–92 (Del. 1998) (emphasis in original) (citation omitted).

[8] *In re CNX Gas Corp. S'holders Litig.,* 2010 WL 2291842, at *15 (Del. Ch. May 25, 2010).

2

governance arrangements under Section 141(a) and have frequently invalidated arrangements that improperly constrain a board's authority.[9]

Crashing into this traditionally immovable object is the seemingly irresistible force of market practice. Corporate planners now regularly implement internal governance arrangements through stockholder agreements. The new wave of stockholder agreements does not involve stockholders contracting among themselves to address how they will exercise their stockholder-level rights. The new-wave agreements contain extensive veto rights and other restrictions on corporate action.[10]

The plaintiff challenges one such governance arrangement. Moelis & Company (the "Company") is a global investment bank. Ken Moelis is its eponymous founder, CEO, and Chairman of the Board. After years of success operating the investment bank as a private entity, Moelis decided to raise capital from the public markets. He

---

[9] *See* Part II.A.1, *infra.*

[10] *See* Gabriel Rauterberg, *The Separation of Voting and Control: The Role of Contract in Corporate Governance*, 38 Yale J. Reg. 1124, 1148–54 (2021) (documenting trend of public companies being subject to stockholder agreements that provide various species of control rights to favored investors); *id.* at 1135 (observing that contemporary shareholder agreements "commonly grant shareholders the right to nominate directors to the board and render that right effective through voting agreements among shareholders who commit to vote for each other's nominees," "grant specific parties--sometimes minority shareholders-- veto rights over a range of major corporate policy decisions, such as whether to fire the CEO, effect a change of control, or change lines of business," "waive major shareholders' obligations to present corporate opportunities to the firm, which the fiduciary duty of loyalty would otherwise require, and they sometimes, though more rarely, restrict the ability of shareholders to sell their shares through tag-along rights (granting one party the right to sell their stock to a bidder on the same terms the other party is being offered), drag-along rights (obligating one party to sell their stock if another party chooses to)," and contain other rights and restrictions); *see also* Jill E. Fisch, *Stealth Governance: Shareholder Agreements and Private Ordering*, 99 Wash. U. L. Rev. 913, 930–33, 946–53 (2021) (discussing similar trend in private companies).

created the Company as a new holding company and reorganized the bank's underlying entity structure. One day before the Company's shares began trading publicly, Moelis, three of his affiliates, and the Company entered into a stockholder agreement (the "Stockholder Agreement").

The Stockholder Agreement is a new-wave agreement. Under its terms, the Company's board of directors (the "Board") must obtain Moelis' prior written consent before taking eighteen different categories of action (the "Pre-Approval Requirements"). The Pre-Approval Requirements encompass virtually everything the Board can do. Because of the Pre-Approval Requirements, the Board can only act if Moelis signs off in advance.

Another set of provisions compels the Board to ensure that Moelis can select a majority of its members (collectively, the "Board Composition Provisions"). The Board is contractually obligated to maintain its size at not more than eleven seats (the "Size Requirement"). Moelis is entitled to name a number of designees equal to a majority of those seats (the "Designation Right"). The Board must nominate Moelis' designees as candidates for election (the "Nomination Requirement"). The Board must recommend that stockholders vote in favor of Moelis' designees (the "Recommendation Requirement"). The Company must use reasonable efforts to enable Moelis' designees to be elected and continue to serve (the "Efforts Requirement"). And the Board must fill any vacancy in a seat occupied by a Moelis designee with a new Moelis designee (the "Vacancy Requirement"). Even if Moelis holds less than a majority of the Company's outstanding voting power, as is currently

4

true, the Board Composition Provisions force the directors to ensure that his designees control the Board.

A final provision in the Stockholder Agreement forces the Board to populate any committee with a number of Moelis' designees proportionate to the number of designees on the full Board (the "Committee Composition Provision"). Because of the Committee Composition Provision, the Board cannot create a committee with a different number of Moelis designees unless Moelis consents. The Board cannot create an independent committee without any Moelis designees unless Moelis consents.

The plaintiff is a Company stockholder who contends that the Pre-Approval Requirements, the Board Composition Provisions, and the Committee Composition Provision (collectively, the "Challenged Provisions") violate Section 141(a). He contends that the Committee Composition Provision also violates Section 141(c).

The plaintiff and the Company have filed cross motions for summary judgment.[11] The plaintiff advances a straightforward argument. Under Chancellor Seitz's seminal decision in *Abercrombie v. Davies*, governance restrictions violate Section 141(a) when they "have the effect of removing from directors in a very substantial way their duty to use their own best judgment on management matters"

---

[11] In addition to the Company's arguments on the merits, the Company sought summary judgment on both laches (contending that the plaintiff waited too long to sue) and ripeness (contending that the plaintiff sued too early). The court issued a separate decision rejecting those defenses. *W. Palm Beach Firefighters Pension Fund v. Moelis & Co. (Timing Decision)*, 2024 WL 550750 (Del. Ch. Feb. 12, 2024).

5

or "tend[] to limit in a substantial way the freedom of director decisions on matters of management policy . . . ."[12] The Delaware Supreme Court has repeatedly endorsed the *Abercrombie* test.[13] This court has repeatedly applied it.[14]

The plaintiff says the Challenged Provisions fail that test. The Pre-Approval Requirements mean that Moelis determines what action the Board can take. The directors cannot exercise their own judgment. They must check with Moelis first and can only proceed with his approval. The Board Composition Provisions prevent the directors from using their best judgment when recommending candidates, filling

---

[12] *Abercrombie v. Davies*, 123 A.2d 893, 899 (Del. Ch. 1956), *rev'd on other grounds,* 130 A.2d 338 (Del. 1957).

[13] *Quickturn II*, 721 A.2d at 1292; *Grimes II*, 673 A.2d at 1214; *see Mayer v. Adams*, 141 A.2d 458, 461 (Del. 1958) (citing *Abercrombie* with approval); *Adams v. Clearance Corp.*, 121 A.2d 302, 305 (Del. 1956) (endorsing *Abercrombie*'s analysis). More recent cases often cite decisions that relied on *Abercrombie*, such as *Quickturn II* and *Grimes II. E.g.*, *CA, Inc. v. AFSCME Empls. Pension Plan* (*AFSCME)*, 953 A.2d 227, 238 (Del. 2008) (relying on *Quickturn II*; concluding that bylaw violated Section 141(a)); *McMullin v. Beran*, 765 A.2d 910, 924–25 & n.66 (Del. 2000) (relying on *Grimes II;* holding that complaint stated a claim that corporation improperly delegated to its controlling stockholder the task of initiating, negotiating, and approving a sale of the company to a third party).

[14] *E.g.*, *In re Bally's Grand Deriv. Litig.*, 1997 WL 305803, at *5–6 (Del. Ch. June 4, 1997) (applying test and finding pleading-stage violation); *Grimes v. Donald (Grimes I)*, 1995 WL 54441, at *9 (Del. Ch. Jan. 11, 1995) (Allen, C.) (applying test and finding no pleading-stage violation), *aff'd*, 673 A.2d 1207 (Del. 1996); *Rosenblatt v. Getty Oil Co*, 1983 WL 8936, at *18 (Del. Ch. Sept. 19, 1983) (applying test and finding no post-trial violation), *aff'd*, 493 A.2d 929 (Del. 1985); *Chapin v. Benwood Found., Inc.*, 402 A.2d 1205, 1210–11 (Del. Ch. 1979) (applying rule on summary judgment and finding a violation), *aff'd sub nom. Harrison v. Chapin*, 415 A.2d 1068 (Del. 1980). More recent cases often cite decisions that relied on *Abercrombie. E.g.*, *Unisuper Ltd. v. News Corp.*, 2005 WL 3529317, at *7 (Del. Ch. Dec. 20, 2005) (relying on *Quickturn II*; finding no pleading-stage violation); *ACE Ltd. v. Cap. Re Corp.*, 747 A.2d 95, 107 (Del. Ch. 1999) (relying on *Quickturn II* and rejecting injunction-stage interpretation of merger agreement that would result in Section 141(a) violation); *Carmody v. Toll Bros.*, 723 A.2d 1180, 1190 & n.27 (Del. Ch. 1998) (relying on *Grimes I* and *Abercrombie*; finding pleading-stage violation).

6

vacancies, and determining the size of the Board. Instead, the directors must keep Moelis in control at the Board-level. And the Committee Composition Provision prevents the directors from exercising discretion when creating committees. Every committee must have the same proportionate number of Moelis' designees as the full Board.

The Company offers a one-size-fits-all response: A contract is a contract is a contract. Delaware corporations possess the power to contract, and contracts necessarily constrain a board's freedom of action. A corporation that has agreed to an exclusive supply contract cannot freely contract with a different supplier. No one would suggest that an exclusive supply contract violates Section 141(a). Not only that, but Delaware corporations can enter into commercial contracts that constrain specific acts otherwise entrusted to the board. Under a credit agreement, for example, declaring a dividend or buying back stock can be events of default. Both are board level decisions, so those provisions limit the board's freedom of action. Yet both are legitimate protections for a lender to demand.

The Company jumps to the conclusion that a court cannot differentiate between an internal governance arrangement and an external commercial contract. Because differentiation is impossible, either all contracts fail under Section 141(a) or none do. Contracting is critical to capitalism. To defend the citadel of contract, Section 141(a) must yield.

That is a version of the soritical paradox, which draws no distinction between a grain of wheat and a heap. If you start with a grain of wheat, you can add one more

7

without making a heap. Because adding a single grain is never enough to transform a non-heap into a heap, you can repeat the process over and over again until you have a mountain of grain. As a matter of formal logic, however, the additional grains never could have created a heap, so there can be no heap. Or the process can operate in reverse. Start with a heap and remove a grain. One grain cannot change a heap into a non-heap. Take away grains as often as you want. You end up with one grain of wheat. Yet as a matter of formal logic, there was never a point when the heap stopped and the non-heap started.

Framed in soritical terms, any external commercial contract limits a board to the same degree as a heap of internal governance constraints. Because there is nowhere to draw the line, Section 141(a) cannot invalidate any contracts.

The soritical paradox bedevils logicians, but not mere humans. We can recognize prototypes and draw distinctions by comparing and contrasting an example with a prototype. A housecat and a lion both have paws, claws, and other feline features. Yet for us, one is a pet and the other a predator. Show me a bobcat or a lynx, and I will keep a respectful distance. Yes, there can be close cases (is a love seat more like a couch or a chair?), but if anyone can make these types of distinctions, courts can. Cases regularly turn on whether the facts are more like one precedent or another. That's how legal reasoning works.

The Challenged Provisions look like something a law professor dreamed up for students to use as a prototypical Section 141(a) violation. No one would mistake the Stockholder Agreement for a supply agreement, credit agreement, or some other

external commercial contract. The parties entered into the Stockholder Agreement just before the Company's shares started trading publicly, after Moelis reorganized the entity structure of his business to facilitate the public offering. The only parties to the contract are the Company, Moelis, and three entities he controls. The Challenged Provisions resemble the type of governance rights associated with preferred stock. With limited exceptions, the Challenged Provisions are drafted to bind the Board, not the Company. The Stockholder Agreement is not tied to any underlying commercial transaction. It is an indefinite agreement that the Board cannot terminate. The Stockholder Agreement only lapses if Moelis takes action that causes one or more conditions to fail.

The Challenged Provisions are therefore part of an internal governance arrangement. That makes them subject to Section 141(a). The question then becomes whether the Challenged Provisions violate the *Abercrombie* test.

The plaintiff challenges the Pre-Approval Requirements individually and collectively. This decision only reaches the collective challenge. Taken together, the Pre-Approval Requirements force the Board to obtain Moelis' prior written consent before taking virtually any meaningful action. With the Pre-Approval Requirements in place, the Board is not really a board. The directors only manage the Company to the extent Moelis gives them permission to do so. This decision need not consider whether some lesser combination of rights might pass muster under Section 141(a). The Pre-Approval Requirements go too far.

The Company responds that the Pre-Approval Requirements do not prevent the Board from exercising its powers because Moelis only has veto rights. That is not true. Moelis has pre-approval rights. The Board cannot approve, authorize, or even plan to take a covered action without Moelis' prior written approval. The Board cannot freely exercise its powers; it must go to Moelis first. Admittedly Moelis does not have the psychic power to control the directors' thoughts and manipulate their actions. Thankfully, technology of that sort does not yet exist. But that does not mean the Board can freely exercise its powers. The directors can only act freely when they do what Moelis wants. Otherwise, they cannot act.

In any event, rewriting the Pre-Approval Requirements as vetoes would not change anything. If framed as eighteen vetoes, the provisions still would give Moelis the ability to block virtually anything the Board might do. The Board would be in the same position as a management team who propose options for a board to review and approve. With Moelis holding the eighteen vetoes, the Board would propose options for Moelis to review and approve. "[T]he power to review is the power to decide."[15] Here, Moelis has expansive power to review, which gives him the power to decide.

Because of the Pre-Approval Requirements, the business and affairs of the Company are managed under the direction of Moelis, not the Board. The Pre-Approval Requirements therefore violate Section 141(a).

---

[15] Stephen M. Bainbridge, *Director Primacy in Corporate Takeovers: Preliminary Reflections*, 55 Stan. L. Rev. 791, 815 (2002); *see also id.* at 807 n.92.

Three of the Board Composition Provisions violate Section 141(a). The Recommendation Requirement improperly compels the Board to recommend Moelis' designees for election. The Vacancy Requirement improperly compels the Board to fill a vacancy created by a departing Moelis designee with another Moelis designee. The Size Requirement improperly enables Moelis to prevent the Board from increasing the number of board seats beyond eleven.

The Committee Composition Provision violates both Section 141(a) and Section 141(c). Determining the composition of committees falls within the Board's authority. A stockholder cannot determine who comprises a committee. The Stockholder Agreement purports to give Moelis that power by contract.

The Company argues that the plaintiff's facial challenge fails nevertheless because these provisions can operate validly as long as Moelis and the Board agree. But when Moelis and the Board agree, the provisions are not operating at all. Directors can freely decide to follow the advice of the corporation's CEO and Chairman. That is different from being prevented from acting by a contractual provision. The Challenged Provisions only have bite when the Board wants to take action and Moelis disagrees. There is no setting where Moelis could invoke the provisions without triggering a Section 141(a) violation.

Three of the Board Composition Provisions do not facially violate Section 141(a). The Designation Right does not violate Section 141(a) because it only permits Moelis to identify a number of candidates for director equal to a majority of the Board. The Company can agree to let Moelis identify a number of candidates. What the

11

Board or the Company does with those candidates is what matters. The Recommendation Requirement improperly compels the Board to support Moelis' candidates, whomever they might be. But there is nothing wrong with a provision that lets Moelis identify candidates.

The Nomination Requirement is also not facially invalid. Moelis could nominate his designees at a stockholder meeting, and the Company can agree through the Nomination Requirement to facilitate that process.

The Company likewise can agree through the Efforts Requirement to facilitate the election and continued service of Moelis' designees. Legitimate efforts could involve including their names on a proxy card or providing disclosures about them in its proxy statement.

There could be as-applied challenges to the Designation Right, Nomination Requirement, and Efforts Requirement, but not a facial challenge.

Moelis did not have to frame an internal corporate governance arrangement using the Stockholder Agreement. He could have accomplished the vast majority of what he wanted through the Company's certificate of incorporation (the "Charter").[16] Even now, the Board could implement many of the Challenged Provisions by using its blank check authority to issue Moelis preferred stock carrying a set of voting rights

---

[16] *E.g., Lehrman v. Cohen*, 222 A.2d 800, 807–08 (Del. 1966) (upholding a charter provision that empowered the general counsel to resolve board deadlocks; noting that although directors cannot delegate their duty to manage the corporation in contravention of Section 141(a), "there is no conflict with that principle where, as here, the delegation of duty, if any, is made . . . via the certificate of incorporation").

12

and director appointment rights.[17] A new class of preferred stock need not upset the Company's equity allocation; it could consist of a single golden share. The certificate of designations for the new preferred stock would become part of the Charter as a matter of law.[18] At that point, because the provisions would appear in the Charter, they would comply with Section 141(a).[19] Although some might find it bizarre that the DGCL would prohibit one means of accomplishing a goal while allowing another, that is what the doctrine of independent legal significance contemplates.[20]

---

[17] 8 *Del. C.* §§ 102(a)(4), 141(d), & 151(a) & (g).

[18] 8 *Del. C.* § 104.

[19] That said, Moelis may not be able to get everything he wanted. Even a charter provision cannot override a mandatory feature of the DGCL. *E.g.*, *Rohe v. Reliance Training Network, Inc.*, 2000 WL 1038190, at *10–11 (Del. Ch. July 21, 2000) (holding that provisions in a certificate of incorporation could not specify directors in advance, provide permanent tenure for directors, or limit the right to remove directors in ways inconsistent with 8 *Del. C.* § 141(k)); *Loew's Theatres, Inc. v. Com. Credit Co.*, 243 A.2d 78, 81 (Del. Ch. 1968) (holding that a charter provision that limited the right to inspect the corporation's books and records to holders of 25% or more of the corporation's stock violated 8 *Del. C.* § 220, which gives that right to "any" stockholder). This court has indicated that some restrictions on board action could be invalid even if they appear in the charter. *See Jones Apparel Gp., Inc. v. Maxwell Shoe Co.*, 883 A.2d 837, 852 (Del. Ch. 2004) (suggesting, without ruling on subject, that charter-based limitations on the board's ability to address charter amendments or mergers could be suspect). Some transactions, like mergers, require a specific sequence of events in which the board initiates action, then the stockholders vote. *E.g.*, 8 *Del. C.* § 251. It is unclear whether a charter provision could require a stockholder's pre-approval, before the board could act. *See, e.g.*, *Blades v. Wisehart*, 2010 WL 4638603, at *11 n.91 (Del. Ch. Nov. 17, 2010); *iXCore, S.A.S. v. Triton Imaging, Inc.*, 2005 WL 1653942, at *1 n.7 (Del. Ch. July 8, 2005); *Tansey v. Trade Show News Networks, Inc.*, 2001 WL 1526306, at *4 (Del. Ch. Nov. 27, 2001). A class-based voting right on a merger, if drafted properly, would be viable. *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998). Regardless, those issues are for another day.

[20] *Compare Keller v. Wilson & Co.*, 190 A. 115, 124–25 (Del. 1936) (affirming injunction against attempt to amend charter to eliminate preferred stockholders' right to accumulated dividends, holding that it was "null and void"), *with Fed. United Corp. v. Havender*, 11 A.2d 331, 336–37 (Del. 1940) (permitting use of merger to convert preferred stock carrying right

Delaware favors private ordering.[21] But the ability to engage in private ordering remains subject to the limitations imposed by the DGCL. Those constraints include Sections 141(a) and (c). Except for the Designation Right, the Nomination Requirement, and the Efforts Requirement, the Challenged Provisions are facially invalid.

## I.  FACTUAL BACKGROUND

The parties filed cross-motions for summary judgment. When there are factual disputes, ruling on cross-motions for summary judgment can be difficult because the court must construe the record in favor of one non-movant for one motion and the

---

to accumulated dividends into new preferred stock and Class A common stock, thereby eliminating the dividend overhang). *See generally* C. Stephen Bigler & Blake Rohrbacher, *Form or Substance? The Past, Present, and Future of the Doctrine of Independent Legal Significance*, 63 Bus. Law. 1 (2007).

[21] *E.g., Manti Hldgs., LLC v. Authentix Acq. Co., Inc.,* 261 A.3d 1199, 1217 (Del. 2021); *Salzberg v. Sciabacucchi*, 227 A.3d 102, 115 (Del. 2020). *See generally* Mohsen Manesh, *The Corporate Contract and the Internal Affairs Doctrine*, 71 Am. L. Rev. 501, 526–34 (2021) (describing the Delaware Supreme Court's contractarian approach to corporate law); Megan Wischmeier Shaner, *Interpreting Organizational "Contracts" and the Private Ordering of Public Company Governance*, 60 Wm. & Mary L. Rev. 985, 1010 (2019) ("[I]n Delaware, the courts have embraced and endorsed the contract metaphor, holding that contract law presides over issues involving both the enforcement and interpretation of the charter and bylaws."); Jill E. Fisch, *Governance by Contract: The Implications for Corporate Bylaws*, 106 Cal. L. Rev. 373, 380 (2018) ("Delaware courts have largely accepted the contractual theory of corporate law."); George Geis, *Ex-Ante Corporate Governance*, 41 J. Corp. L. 609, 611 (2016) ("[T]he influential Delaware courts seem to be taking a more permissive attitude, based in part on the parallels between contract law and the corporate relationship.").

other for the other motion.[22] Here, the competing standards are not a problem, because the pertinent facts are undisputed.[23]

## A.    The Company And Its IPO

In 2007, Moelis formed a new boutique investment bank. He ran the business as CEO and Chairman of the Board. The bank enjoyed immediate success and expanded globally. By 2013, it was generating over $400 million in annual revenue.

In 2014, Moelis decided to raise capital by selling shares to the public. Before the IPO, he transferred the bank's business to a newly formed Delaware limited partnership named Moelis & Company Group LP (the "Group"). The Group issued general partner units and Class A limited partnership units.

Moelis formed the Company to be the new publicly traded entity. The Company owns all of the member interests in an LLC that serves as the general partner of the Group. The Company also owns Class A units that give it a 27% economic interest in the Group.

---

[22] Court of Chancery Rule 56(h) mitigates that problem when parties do not specifically identify issues of material fact. It states: "Where the parties have filed cross motions for summary judgment and have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."

[23] Citations in the form "PX __" refer to exhibits that the plaintiff submitted with its opening brief or reply brief. Citations in the form "DX__" refer to exhibits that the Company submitted with its opening brief and reply brief. Citations in the form "Tr.__" are to the transcript of the oral argument. Dkt. 30.

Moelis allocated the other 73% of the Class A units to Moelis & Company Partner Holdings LP ("Holdings"). Moelis and other bankers and employees own the equity in Holdings. Moelis controls Holdings.

The Company has two authorized classes of common stock. In its IPO, the Company issued shares of its Class A common stock to the public, and those shares trade on the New York Stock Exchange. The Class A shares carry one vote per share.

Only Holdings received Class B common stock. The Class B shares carry ten votes per share as long as Moelis

(A) maintains directly or indirectly ownership of an aggregate of at least 4,458,445 shares of Class A Common Stock . . . .;

(B) maintains directly or indirectly beneficial ownership of at least five percent (5%) of the issued and outstanding Class A Common Stock [and Class A units issued by the Group, which are convertible into Class A shares];

(C) has not been convicted of a criminal violation of a material U.S. federal or state securities law that constitutes a felony or a felony involving moral turpitude;

(D) is not deceased; and

(E) has not had his employment agreement terminated . . . because of a breach of his covenant to devote his primary business time and effort to the business and affairs of the [Company] or because he suffered an Incapacity.[24]

---

[24] DX 3, Charter art. 4, pt. 2(a)(ii) (formatting added). The Charter authorized the issuance of one billion shares of Class A common stock, and the Company issued 160 million shares in its IPO. The requirement to hold 4,458,445 shares of Class A common stock or instruments convertible into shares equates to owning approximately 0.4% of the authorized shares and 2.7% of the shares issued in the IPO.

16

That set of conditions is known as the "Class B Condition."[25]

## B. The Stockholder Agreement

In the prospectus for the IPO, the Company disclosed that Moelis and the Company would enter into the Stockholder Agreement. On April 15, 2014, one day before the Class A shares began trading, the Company, Moelis, Holdings, and two other Moelis affiliates executed the Stockholder Agreement.[26] No one disputes that investors who purchased stock in the IPO had notice of the Stockholder Agreement.

The Stockholder Agreement remains in effect as long as a modified version of the Class B Condition is satisfied. Known as the "Secondary Class B Condition," the requirements are the same as the Class B Condition, except that the specific ownership requirement for shares of Class A stock or instruments convertible into Class A shares drops from 4,458,445 to 2,229,222.[27] If the Secondary Class B Condition fails, then the Stockholder Agreement terminates.[28]

The Stockholder Agreement grants Moelis expansive rights. Technically, the Stockholder Agreement allocates many of the rights to Holdings, but because Moelis controls Holdings, Moelis controls those rights. For simplicity, this decision refers to Moelis, rather than Holdings, as being able to exercise those rights. The plaintiff

---

[25] *Id.*

[26] PX 1 (cited as "SA").

[27] *Id.* at 6.

[28] *Id.* §§ 5.1(b)–(c).

17

challenges the Pre-Approval Requirements, the Board Composition Provisions, and the Committee Composition Provision.

## 1. The Pre-Approval Requirements

The Stockholder Agreement contains the Pre-Approval Requirements. The pertinent language states:

> So long as the Class B Condition is satisfied, the Board shall not authorize, approve or ratify any of the following actions or any plan with respect thereto without the prior approval (which approval may be in the form of an action by written consent) of [Moelis]:
>
> (i) any incurrence of indebtedness (other than inter-company indebtedness), in one transaction or a series of related transactions, by the Company or any of its Subsidiaries or Controlled Affiliates in an amount in excess of $20 million;
>
> (ii) any issuance by the Company or any of its Subsidiaries or Controlled Affiliates in any transaction or series of related transactions of equity or equity-related securities (other than preferred stock, which is addressed by Section 2.1(a)(iii) below) which would represent, after such issuance, or upon conversion, exchange or exercise, as the case may be, at least three percent (3%) of the total number of votes that may be cast in the election of directors of the Company if all issued and outstanding Class A Shares were present and voted at a meeting held for such purpose . . . ;
>
> (iii) the issuance of any preferred stock;
>
> (iv) any equity or debt commitment to invest or investment or series of related equity or debt commitments to invest or investments by the Company . . . in an amount greater than $20 million;
>
> (v) any entry by the Company or any of its Subsidiaries or Controlled Affiliates into a new line of business that requires an investment in excess of $20 million;
>
> (vi) the adoption of a stockholder rights plan by the Company;
>
> (vii) any removal or appointment of any officer of the Company that is, or would be, subject to Section 16 of the Exchange Act;

(viii) any amendment to the Certificate of Incorporation or By-Laws;

(ix) any amendment to the Partnership LP Agreement;

(x) the renaming of the Company;

(xi) the adoption of the Company's annual budget and business plans and any material amendments thereto;

(xii) the declaration and payment of any dividend or other distribution (other than such dividends or other distributions (i) required to be made pursuant to the terms of any outstanding preferred stock of the Company or (ii) in connection with the transactions described in the IPO Registration Statement);

(xiii) the entry into any merger, consolidation, recapitalization, liquidation, or sale of the Company or all or substantially all of the assets of the Company or consummation of a similar transaction involving the Company . . . ;

(xiv) voluntarily initiating any liquidation, dissolution or winding up of the Company or permitting the commencement of a proceeding for bankruptcy, insolvency, receivership or similar action with respect to the Company or any of its Subsidiaries or Controlled Affiliates;

(xv) the entry into or material amendment of any Material Contract;

(xvi) the entry into any transaction, or series of similar transactions or Contract . . . that would be required to be disclosed under Item 404 of Regulation S-K under the Exchange Act;

(xvii) the initiation or settlement of any material Action; or

(xviii) changes to the Company's taxable year or fiscal year.[29]

---

[29] *Id.* § 2.1(a).

Viewed in their totality, the Pre-Approval Requirements mean that the Board must get Moelis' signoff in advance for virtually any action the directors might want to take.[30]

## 2. The Board Composition Provisions

As long as the Class B Condition is satisfied, the Board Composition Provisions give Moelis the right to determine the size of the Board and select a majority of the directors who serve on it. There are six Board Composition Provisions: the Size Requirement, the Designation Right, the Nomination Requirement, the Recommendation Requirement, the Efforts Requirement, and the Vacancy Requirement.

---

[30] After the Class B Condition fails, as long as the Secondary Class B Condition is satisfied, the Board continues to operate under three pre-approval requirements. The pertinent language states:

> After the Class B Condition ceases to be satisfied, for so long as the Secondary Class B Condition is satisfied, the Board shall not authorize, approve or ratify any of the following actions or any plan with respect thereto without the prior approval (which approval may be in the form of an action by written consent) of [Moelis]:
>
> (i) any removal or appointment of the Chief Executive Officer of the Company;
>
> (ii) any amendment to the Certificate of Incorporation or Bylaws that materially and adversely affects in a disproportionate manner the rights of Mr. Moelis; or
>
> (iii) any amendment to the Partnership LP Agreement that materially and adversely affects in a disproportionate manner the rights of Mr. Moelis.

*Id.* § 2.1(b). Because they are not currently operative, this decision does not analyze this alternative set of pre-approval requirements.

Section 4.1(a) of the Stockholder Agreement allows Moelis to select a number of designees currently equal to a majority of the Board. It states:

> Until the Class B Condition ceases to be satisfied, the Company and each Stockholder shall take all reasonable actions within their respective control (including voting or causing to be voted all of the Voting Securities held of record by such Stockholder or Beneficially Owned by such Stockholder by virtue of having voting power over such Voting Securities, and, with respect to the Company, as provided in Sections 4.1(c) and (d) ) [sic] so as to cause to be elected to the Board, and to cause to continue in office,
>
> [1] not more than eleven (11) directors (or such other number of directors as [Moelis] may agree to in writing),
>
> [2] and at any given time:
>
> (i) until the Class B Condition ceases to be satisfied, a number of directors equal to a majority of the Board shall be individuals designated by [Moelis]; and
>
> (ii) after the Class B Condition ceases to be satisfied, for so long as the Secondary Class B Condition is satisfied, a number of directors (rounded up to the nearest whole number) equal to one quarter of the Board shall be individuals designated by [Moelis].[31]

That language includes the Size Requirement, which requires that the Company use its best efforts to maintain a Board of not more than eleven directors. It includes the Designation Right, which entitles Moelis to designate a number of persons equal to a majority of the Board (and after the Class B Condition fails, one quarter of the Board). It also contains the first part of the Efforts Requirement, under which the Company must take all reasonable actions within its control so as to cause Moelis' designees to be elected to the Board and to remain in office.

---

[31] *Id.* § 4.1(a) (bracketed numbers and formatting added).

Section 4.1(c) of the Stockholder Agreement contains two more Board Composition Provisions. It states:

> The Company agrees to include in the slate of nominees recommended by the Board those persons designated by [Moelis] in accordance with Section 4.1(a) and to use its reasonable best efforts to cause the election of each such designee to the Board, including nominating such designees to be elected as directors, in each case subject to applicable law.[32]

This provision contains the Nomination Requirement, under which the Company must nominate Moelis' designees for election as directors. It also contains the Recommendation Requirement, under which the Board must recommend in favor of Moelis' designees, whoever they might be. And it includes the second part of the Efforts Provision, which requires that the Company "use its reasonable best efforts to cause the election of such designees to the Board."

Finally, Section 4.1(d) of the Stockholder Agreement contains the Vacancy Requirement. It states:

> In the event that a vacancy is created at any time by the death, disability, retirement, resignation or removal of any director who is designated by [Moelis] in accordance with Section 4.1(a), the Company agrees to take at any time and from time to time all actions necessary to cause the vacancy created thereby to be filled as promptly as practicable by a new designee of [Moelis].[33]

Under this provision, Moelis can require that the Company replace any of his designees who leave the Board with a new designee.

---

[32] *Id.* § 4.1(c).

[33] *Id.* § 4.1(d).

### 3. The Committee Composition Provision

As long as the Stockholder Agreement remains in effect, the Committee Composition Provision gives Moelis the right to have a proportionate number of his designees serve on any board committee. The pertinent language states:

> For so long as this Agreement is in effect, the Company shall take all reasonable actions within its control at any given time so as to cause to be appointed to any committee of the Board a number of directors designated by [Moelis] that is up to the number of directors that is proportionate (rounding up to the next whole director) to the representation that [Moelis] is entitled to designate to the Board under this Agreement, to the extent such directors are permitted to serve on such committees under the applicable rules of the SEC and the New York Stock Exchange or by any other applicable stock exchange.[34]

Currently, Moelis has the right to designate a majority of the Board, so the Committee Composition Provision requires that every committee have a majority of Moelis designees. Without Moelis' consent, the Board cannot create a committee with a lesser number of Moelis designees. The Board cannot create a committee of non-Moelis designees.

### C. Moelis' Ownership Declines After The IPO.

After the IPO, Moelis controlled 96.8% of the Company's outstanding voting power. Since the IPO, Moelis has sold off stock, and his voting power has declined. In February 2021, his voting power fell below 50%, causing the Company to no longer qualify as a controlled company under New York Stock Exchange rules. The Company changed the membership of its Board and committees to comply with the rules for

---

[34] *Id.* § 4.2.

non-controlled companies. Moelis is still entitled to designate a majority of the Board, but he waived that right in 2021, 2022, and 2023 to ensure compliance with the rules for non-controlled companies.

Presently, Moelis owns approximately 6.5% of the outstanding equity and possesses the right to obtain additional shares that would bring his equity interest to 11.5%. The Class B Condition therefore continues to be satisfied. Because Moelis continues to beneficially own all the Company's Class B stock, his voting power currently stands at 40.4%.

## D. This Litigation

The plaintiff is an owner of Class A stock. He purchased his shares on November 19, 2014. He filed this action on March 13, 2023. The plaintiff seeks declarations that the Challenged Provisions are invalid and unenforceable. The Company answered the complaint, and the parties filed cross-motions for summary judgment.

## II. LEGAL ANALYSIS

Under Court of Chancery Rule 56, summary judgment "shall be rendered forthwith" if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). The parties agree on the facts. They only disagree about an issue of law: whether the Challenged Provisions facially violate the DGCL. The plaintiff claims that all of the Challenged Provisions facially violate Section 141(a). They contend that the Committee Composition Provision also facially violates Section 141(c).

24

This decision starts by framing the elements of a Section 141(a) claim. That statute presents a puzzle, because its plain language prohibits restrictions on board authority that do not appear in the DGCL or the corporate charter. Every contract restricts board authority to some degree, so how does a court distinguish contractual provisions that violate Section 141(a) from those that do not?

To answer that question, this decision surveys the Section 141(a) precedents. That effort is tedious but fruitful, because it reveals a clear rule. Although none of the cases say so expressly, they show that a court applying Section 141(a) must first determine whether the challenged provision constitutes part of the corporation's internal governance arrangement. If not, then the inquiry ends. If so, then Section 141(a) applies.

This decision concludes that the Challenged Provisions are part of the Company's internal governance arrangement. Not only that, but the Stockholder Agreement in general and the Challenged Provisions in particular offer a prototype for what a governance arrangement looks like.

Once Section 141(a) applies, the court applies the *Abercrombie* test. The plaintiff attacks the Pre-Approval Requirements both individually and in the aggregate. This decision only considers them in the aggregate. Taken together, the Pre-Approval Requirements are facially invalid under Section 141(a). The Recommendation Requirement, the Vacancy Requirement, and the Size Requirement are also facially invalid under Section 141(a). The Committee Composition Provision is facially invalid under both Section 141(a) and Section 141(c). The Designation

Right, the Nomination Requirement, and the Efforts Requirement are not facially invalid because they could operate legitimately.

The decision wraps up by considering the Company's policy arguments.

## A.    The Elements Of A Section 141(a) Claim

The plaintiff contends that the Challenged Provisions violate Section 141(a) of the DGCL. To reiterate, that section states: "The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation."[35] To succeed on a facial challenge, the plaintiff must show that the Challenged Provisions cannot operate lawfully in the face of Section 141(a) "*under any circumstances*."[36]

An extensive body of Delaware precedent analyzes Section 141(a) claims.[37] Many decisions have invalidated express limitations on board authority when they

---

[35] 8 *Del. C.* § 141(a).

[36] *Salzberg*, 227 A.3d at 113 (emphasis in original).

[37] *See* Part II.A.1, *infra.* Decisions from outside of Delaware have recognized comparable claims. The *Abercrombie* and *Chapin* decisions cited older precedents. *See Chapin*, 402 A.2d at 1211 (collecting authorities); *Abercrombie*, 123 A.2d at 898 (same). Examples include *West v. Camden*, 135 U.S. 507, 520–22 (1890) (holding invalid agreement by which director committed in advance to keep plaintiff permanently employed as vice president; collecting authorities); *Gilchrist v. Hatch*, 100 N.E. 473, 474 (Ind. Ct. App. 1913) (holding invalid contract by which majority stockholder committed to cause directors to keep counterparty employed as officer at substantial salary; collecting authorities), *rev'd on other grounds*, 106 N.E. 694 (Ind. 1914); *Van Slyke v. Andrews*, 178 N.W. 959, 960 (Minn. 1920) (holding invalid agreement by which directors agreed to maintain specific person as officer for specific period of time at specified salary; collecting authorities); *Long Park v. Trenton-New Brunswick Theatres Co.*, 77 N.E.2d 633, 634–35 (N.Y. 1948) (addressing agreement under which stockholders agreed to select business manager without approval of board and

26

did not appear in the charter and restricted a significant board function. Others have considered Section 141(a) claims and acknowledged their doctrinal legitimacy, but held that the plaintiff did not plead or prove a violation. Only one decision, *Sample v. Morgan*,[38] argues for rejecting the Section 141(a) canon entirely and evaluating contractual restrictions on board authority exclusively for fiduciary compliance. The overwhelming weight of authority thus recognizes the viability of a Section 141(a) challenge to a contract like the Stockholder Agreement.

Delaware decisions regularly recognize that ordinary commercial contracts do not raise Section 141(a) concerns. One way to avoid implicating commercial contracts would be to interpret the requirement that restrictions on board authority appear only in the DGCL or the charter as a "bylaw excluder"; it tells corporate planners that provisions in the bylaws cannot restrict the board's power, but says nothing more

---

to provide that manager could not be changed by board; deeming agreement "clearly in violation of" statutory requirement paralleling Section 141(a)); *Clark v. Dodge*, 199 N.E. 641, 642–43 (N.Y. 1936) (acknowledging that governance agreements could violate statutory requirement paralleling Section 141(a) but holding that restriction at issue was not meaningful); *Manson v. Curtis*, 119 N.E. 559, 562 (N.Y. 1918) (considering agreement between two stockholders under which plaintiff would manage business, president would be inactive, and plaintiff and defendant would each elect directors who would not interfere with plaintiff's management; holding agreement invalid as conflicting with statutory requirement paralleling Section 141(a); "Clearly the law does not permit the stockholders to create a sterilized board of directors. Corporations are the creatures of the state, and must comply with the exactions and regulations it imposes. We conclude that the agreement here is illegal and void . . . ."); *Dubbs v. Kramer*, 153 A. 733, 734 (Pa. 1931) (holding that director cannot contract in advance regarding how he to vote; stating that "[a] contract made by a director that limits or restricts him in the free exercise of his discretion or judgment is against public policy"; collecting authorities). Starting with *Abercrombie* and *Chapin*, Delaware developed its own body of Section 141(a) precedent. This decision relies on the Delaware cases. The older decisions from other jurisdictions nevertheless support the outcome reached here.

[38] 914 A.2d 647 (Del. Ch. 2007).

than that.[39] But that interpretation cannot coexist with the weight of Section 141(a) precedent. As discussed below, Section 141(a) decisions have rendered invalid provisions in stockholder agreements, agreements among directors, rights plans, stock purchase agreements, asset sale agreements, and merger agreements. Under extant case law, the mere fact that a provision appears in a contract and not in the bylaws does not create a safe harbor from Section 141(a) challenge.

What has proved elusive is some method of distinguishing invalid restrictions on board authority from valid exercises in contracting. But a careful review of the Section 141(a) canon reveals a clear rule. Although none of the Section 141(a) cases say so expressly, the decisions distinguish between external commercial agreements and provisions that seek to govern the corporation's internal affairs. All of the successful Section 141(a) challenges have involved contracts or provisions tied to a corporation's internal affairs. The most controversial decisions have involved challenges to provisions in merger agreements where an internal affairs dimension of the merger agreement overlapped with the contract rights of a third-party buyer. There are no Section 141(a) decisions that invalidate or even raise serious questions about provisions in commercial agreements.

The decisions also show the types of restrictions that can violate Section 141(a). The cases consistently invalidate provisions that purport to bind the board or

---

[39] *See Jones Apparel*, 883 A.2d at 848 (discussing concept of "bylaw excluder").

28

individual directors explicitly. This decision refers to those as direct, board-level restrictions.

A direct, board-level restriction targets the board itself or a director. But if Section 141(a) only applied to those restrictions, then corporate planners could circumvent the statute by specifying that a provision imposed an obligation on the corporation. The Section 141(a) decisions show that a provision can be invalid if requires or forbids action on an issue that falls exclusively within the board's authority. A provision also can be invalid if it calls for an actor other than the board to make a determination or perform a task where the DGCL or the common law requires board action. This decision refers to those as direct, corporate-level restrictions.

Restrictions can also operate indirectly by imposing consequences for particular action. In *Abercrombie*, the agreement called for the signatory stockholders to immediately remove any director who did not vote in accordance with the outcome from a dispute-resolution mechanism. Chancellor Seitz held that immediate removal was a sufficiently powerful consequence to render the provision invalid under Section 141(a). Or, in rare circumstances, a contract could impose consequences on the corporation that are so onerous that a board could not risk triggering them. The consequences must be extreme, because the ordinary consequences of breach do not implicate Section 141(a). This decision calls those restrictions, respectively, indirect board-level restrictions and indirect, corporate-level restrictions.

That taxonomy generates the following matrix:

|  | Direct | Indirect |
|---|---|---|
| Board-level | Purports to bind the board or individual directors, as in "the board shall" or "the board shall not." | Imposes a sufficiently onerous consequence on the board or individual directors for taking or not taking the specified action. |
| Corporate-level | Purports to bind the company, as in "the company shall" or "the company shall not," where the issue requires a board decision. | Imposes a sufficiently onerous consequence on the company for taking or not taking an action that requires a board decision. |

## 1. The Decisions

The Section 141(a) decisions can be grouped into seven categories. Six of the categories involve multiple decisions. They are:

- Cases involving stockholder or director agreements;

- Cases involving rights plans;

- Cases involving CEO employment agreements;

- Cases involving improper delegations of board power;

- Cases involving the termination of merger agreements; and

- Cases involving bylaws.

The seventh category includes just one case—*Sample.* That is the only case that proposes rejecting the Section 141(a) inquiry entirely.

### a. Stockholder And Director Agreements: *Abercrombie*, *Marmon*, *Schroeder*, and *Chapin*

The first category includes four cases. *Abercrombie*, *Marmon*,[40] and *Schroeder*[41] involved stockholder agreements. *Chapin* involved a director agreement. The cases showcase the invalidity of direct and indirect board-level restrictions.

### i. *Abercrombie*

The cornerstone of the contemporary Section 141(a) canon is *Abercrombie*.[42] The corporation had ten stockholders, and all ten entered into a stockholder

---

[40] *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512 (Del. Ch. Apr. 28, 2004).

[41] 2018 WL 11264517 (Del. Ch. Jan. 10, 2018) (ORDER).

[42] There were earlier Delaware cases that invalidated restrictions on board authority. *See, e.g.*, *SEC v. Transamerica Corp.*, 67 F. Supp. 326, 330 (D. Del. 1946) (applying Delaware law; holding that proposed bylaw, which required directors to send report on annual meeting to stockholders, would conflict with Section 141(a) and was not proper subject for action at annual meeting because "even if carried by a majority vote of the stockholders, [it] would not be binding upon the officers and directors"), *modified on other grounds*, 163 F.2d 511 (3d Cir. 1947); *Hanssen v. Pusey & Jones Co.*, 276 F. 296, 302–04 (D. Del. 1921) (applying Delaware law; holding that agreements under which company committed to allow third party creditor to select its treasurer, to give treasurer complete control over corporate funds, and to direct treasurer to manage the business for the principal benefit of third party creditor were invalid as "a practical nullification of the Delaware statute requiring that a Delaware corporation shall be managed by a board of directors; the purpose of that statute being that the corporation shall be so managed for the benefit of all parties in interest and not merely for some of such parties"), *aff'd* 279 F. 488 (3d. Cir. 1922), *rev'd on other grounds* 261 U.S. 491 (1923) (holding district court lacked equitable jurisdiction); *Lippman v. Kehoe Stenograph Co.*, 11 Del. Ch. 80, 86, 88–89 (Del. Ch. 1915) (Wolcott, C.) (holding that while incorporators could act by proxy, directors could not; invalidating governance arrangement in which director purported to act by proxy because director would be bound by what proxyholder decided, and because director would not benefit from participating in discussion with other directors). Contemporary decisions typically use *Abercrombie* as their starting point, so this decision does not dwell on the earlier decisions. They nevertheless support the outcome reached here.

agreement shortly after the corporation was formed.[43] That agreement gave them each the right to designate a number of directors proportionate to their ownership stake and bound each to vote for the resulting slate.[44]

Three years later, six of the stockholders entered into a second stockholder agreement, which they called the "agents agreement."[45] Those six stockholders had the right to designate eight directors, comprising a board majority.[46]

The purpose of the agents agreement was to ensure that the eight directors voted as a block. To that end, the stockholders agreed to appoint their eight designees as agents who would attempt to reach consensus on how they would vote as directors (the "Voting Provision"). If seven out of eight agents agreed, then all would vote that way.[47] If seven could not agree, then an arbitrator would determine how they would vote. [48] The operative language stated:

> The Shareholders further agree that Ralph K. Davies shall vote, and that the corporate Shareholders will use their best efforts to cause their representatives on the Board of Directors . . . to vote . . . as determined by the Agents or by any seven thereof, and that in the event of the failure of any such director so to vote all parties hereto will cooperate and act in any legal manner possible to cause any director voting contrary to any such determination by the Agents to resign or be removed and to be replaced upon the Board of Directors . . . . In the event of any failure of

---

[43] *Abercrombie*, 123 A.2d at 894–95.

[44] *Id.*

[45] *Id.* at 895.

[46] *Id.*

[47] *Id.* at 895–98.

[48] *Id.* at 897.

> any seven of the directors representing the Shareholders so to agree, the dispute, wherever possible to do so, shall be settled by submission to an arbitrator or arbitrators appointed in the same manner as in the case of a disagreement between the Agents.[49]

Davies was both a stockholder and a director, so he bound himself to vote as a director in accordance with the Voting Provision.[50] The other five stockholders were corporations who designated individuals as directors.[51] They agreed to "use their best efforts" to cause their designees to vote in accordance with the Voting Provision.[52] All of the signatories to the agents agreement committed to remove any designee who failed to vote in accordance with the Voting Provision.[53]

Chancellor Seitz held that the Voting Provision violated Section 141(a). He explained that "our corporation law does not permit actions or agreements by stockholders which would take all power from the board to handle matters of substantial management policy."[54] For Davies, the Voting Provision was "clearly illegal" because he bound himself to vote as a director in the manner determined by

---

[49] *Id.*

[50] *Id.* at 894–95 & n.1.

[51] *Id.*

[52] *Id.* at 897.

[53] *Id.*

[54] *Id.* at 898.

the agents or an arbitrator.[55] It operated as a direct, board-level restriction, which violated Section 141(a).

For the other directors, the issue was more complex. They did not technically bind themselves to vote as determined by someone else, but the stockholders were bound to remove any non-compliant director. Chancellor Seitz determined that this mechanism imposed was also invalid:

> Because it tends to limit in a substantial way the freedom of director decisions on matters of management policy it violates the duty of each director to exercise his own best judgment on matters coming before the board. Moreover, a director-agent might here feel bound to honor a decision rendered under the Agreement even though it was contrary to his own best judgment.[56]

The provision operated as an indirect, board-level restriction that was functionally equivalent to a direct, board-level restriction.

Chancellor Seitz concluded: "So long as the corporate form is used as presently provided by our statutes this Court cannot give legal sanction to agreements which have the effect of removing from directors in a very substantial way their duty to use their own best judgment on management matters."[57] The Voting Provision was

---

[55] *Id.*

[56] *Id.* at 899.

[57] *Id.*

"invalid as an unlawful attempt by certain stockholders to encroach upon the statutory powers and duties imposed on directors by the Delaware corporation law."[58]

The *Abercrombie* decision offers three powerful lessons. First, a provision in a stockholder agreement can violate Section 141(a). Second, a direct board-level restriction is invalid, as shown by the ruling about how the Voting Provision applied to Davies. Third, an indirect board-level restriction is also invalid, as shown by the ruling about how the Voting Provision applied to the other directors.

### ii.     *Marmon* and *Schroeder*

Two later cases also dealt with stockholder agreements. In *Marmon*, Justice Jacobs was sitting by designation after being elevated to the Delaware Supreme Court.[59] A privately held company had not made any disclosures to its stockholders in three years.[60] When a stockholder sought books and records to understand what was going on, the company contended that under agreements with its major

---

[58] Chancellor Seitz upheld other provisions of the agents agreement that governed stockholder voting. On appeal, the Delaware Supreme Court held that the agents agreement attempted to establish a voting trust without complying with the requirements of Section 218 of the DGCL, rendering the agreement as a whole invalid. *See Abercrombie v. Davies*, 130 A.2d 338, 347 (Del. 1957). The Delaware Supreme Court therefore did not reach the Chancellor's ruling on the Voting Provision. In the interim, however, the Delaware Supreme Court had cited *Abercrombie*'s ruling on the Voting Provision with approval, thereby endorsing Chancellor Seitz's reasoning. *See Adams,* 121 A.2d at 305.

[59] 2004 WL 936512, at *1.

[60] *Id.* at *5.

stockholders, it could not disclose information to small stockholders.[61] Justice Jacobs made short work of that idea:

> That response, if truthful, is difficult to characterize in neutral terms. The directors of a Delaware corporation have a duty to disclose material facts to all of the corporation's shareholders. The directors are not free arbitrarily to pick and choose the shareholders to whom they will or will not make disclosure. *Nor can the corporation be heard to defend such a practice on the basis that it has bound itself contractually not to make such disclosures. Arbinet's directors were not free to contract away disclosure obligations that they had a fiduciary duty to observe.*[62]

The stockholder agreements could not limit the board's powers under Section 141(a) and its concomitant obligations to disclose information to stockholders. It is not clear whether the disclosure restrictions were drafted as direct, board-level restrictions or as direct, corporate-level restrictions. Either way, the provisions were invalid.

In *Schroeder*, stockholders bound themselves to elect (i) three directors designated by the holders of a majority of the common stock, "one of whom shall be the CEO," (ii) two designated by the holders of a majority of the preferred stock, and (iii) two independent, non-employee directors selected by the holders of a majority of the common stock and approved by the holders of a majority of the preferred stock.[63] The stockholders disagreed over whether the common stockholders could select the CEO, at which point the signatory stockholders had to vote for him as one of the three

[61] *Id.*

[62] *Id.* at *4 (emphases added) (footnotes omitted).

[63] 2018 WL 11264517, at *3.

directors designated by the common stock, or whether the board selected the CEO, at which point the common stockholders had to designate him as one of their directors.[64]

The court resolved the interpretative question by considering the implications of Section 141(a). The decision held that appointing a CEO is a core board function and noted that the company's bylaws called for the board to select the CEO.[65] If the stockholder agreement enabled the common stockholders to select the CEO, then the provision would be invalid because it would conflict with Section 141(a) and the bylaws.[66] But if the board had the power to identify the CEO, at which point the common stockholders had to name him as one of their three designees, then the stockholder agreement would operate consistently with Section 141(a) and the bylaws. The court adopted the latter interpretation as the only reasonable one and held that all of the signatory stockholders bound themselves to vote for the CEO that the board had selected.[67]

Like *Abercrombie*, the rulings in *Marmon* and *Schroeder* show that provisions in stockholder agreements can violate Section 141(a). They also show that a provision

---

[64] *Id.*

[65] *Id.* at \*2, 4.

[66] *Id.* at \*4 ("If [the agreement] unambiguously attempted to limit the Board's authority to select the CEO, the provision would be ineffective because it would conflict with the DGCL. Moreover, if it were an attempt to limit the Board's exercise of its authority over the business and affairs of the corporation in a manner not contemplated by statute, the provision would represent an impermissible delegation of the Board's authority." (citations omitted)).

[67] *Id.*

need not deprive a board of virtually all of its powers, like the agents agreement in *Abercrombie*, to give rise to a statutory issue. The agreements in *Marmon* only restricted disclosure, and the agreement in *Schroeder* only governed the selection of the CEO. Both created problems under Section 141(a).

### iii.    *Chapin*

The *Chapin* case involved an agreement among directors.[68] The entity was a Delaware nonstock corporation, and its directors (called trustees) comprised its members by virtue of being trustees. When the corporation was formed in 1944, there were three trustees. By 1946, the trustees had added a fourth. In 1952, the four trustees "became concerned about the balance between them being upset by the death of one of their number," so they entered into an agreement that specified in advance who would succeed each trustee.[69] The charter empowered the trustees in office to fill any vacancies, without limitation.[70]

Over the next twenty years, each new combination of trustees entered into a similar agreement.[71] In the last iteration, executed in 1972, the trustees also bound themselves and their successors to maintain a board of four, and they agreed that

---

[68] 402 A.2d at 1207–08.

[69] *Id.* at 1207.

[70] *Id.* at 1206.

[71] *Id.* at 1207–08.

any board action would be invalid unless the board had four members. The charter, by contrast, authorized a board of as few as three and as many as five.[72]

In 1976, three of the trustees voted to rescind the 1972 agreement. The fourth did not vote and died two months later. The three trustees did not replace him until 1977, when they increased the number of trustees to five.[73]

Shortly thereafter, the trustees became concerned about the validity of the actions they had taken since voting to rescind the 1972 agreement. The trustees sought a declaration that the agreement could not have been binding because it violated Section 141(a).[74]

Chancellor Brown, then serving as a Vice Chancellor, appointed an amicus curiae to oppose the petition.[75] The amicus argued that because the trustees were also members of the non-stock corporation, the 1972 agreement operated as a valid stockholder agreement. Vice Chancellor Brown disagreed: "A stockholder has an ownership interest in his shares. To the extent that he contracts away the rights deriving from that interest, it is his prerogative to do so."[76] The trustees were only members because of their status as trustees. That meant they had "no personal

---

[72] *Id.* at 1206.

[73] *Id.* at 1208–09.

[74] *See id.* at 1210–11.

[75] *Id.* at 1209.

[76] *Id.*

ownership rights which they can contract away."[77] They only had their obligations as trustees, "and the contractual attempt to relinquish that duty in return for the relinquishment of a similar duty by the other trustees does not constitute consideration for a contract . . . ."[78]

The amicus next argued that by entering into the 1972 agreement, the trustees had not prevented themselves from exercising their judgment as trustees.[79] Instead, they had exercised that authority by agreeing on what the size of the board should be and who should replace them. Vice Chancellor Brown rejected that argument as well. Citing *Abercrombie* and other precedents, he relied on "the longstanding rule that directors of a Delaware corporation may not delegate to others those duties which lay at the heart of the management of the corporation."[80] He invalidated both the size restriction and the agreement regarding the filling of vacancies.[81]

Like *Abercrombie*'s ruling about Davies, *Chapin* shows that direct, board-level restrictions are invalid. Like *Marmon* and *Schroeder, Chapin* shows that a restriction need not extend to all of a board's activities to violate Section 141(a). In *Chapin*, the

---

[77] *Id.* at 1210.

[78] *Id.*

[79] *See id.*

[80] *Id.* at 1210–11 (collecting authorities).

[81] *Id.* at 1211 (quoting *Abercrombie*, 123 A.2d at 899).

restriction only governed filling vacancies and the size of the board, yet those provisions created Section 141(a) problems.

*Chapin* is also significant for another reason. It did not involve a stockholder invoking Section 141(a) to challenge a governance regime; it involved a board invoking Section 141(a) defensively to protect its authority. The *Chapin* decision thus illustrates how Section 141(a) operates neutrally to preserve a space for board action. Nor is *Chapin* an outlier on that score. Cases in other categories that this decision discusses also show corporations invoking Section 141(a) defensively.

### b. Rights Plans: *Toll Brothers*, *Quickturn II*, and *UniSuper*

The next group of cases involved stockholder rights plans. In *Toll Brothers,* then-Vice Chancellor Jacobs considered a provision that prevented particular directors from redeeming the rights. [82] In *Quickturn II*, the Delaware Supreme Court considered a provision that delayed the ability of directors to redeem the rights. [83] In *UniSuper*, Chancellor Chandler considered whether a board bind itself to condition the extension of a rights plan beyond one year on stockholder approval. [84]

The *Toll Brothers* decision concerned a "dead hand" feature, which meant that only the incumbent directors who adopted the rights plan (or their hand-picked

---

[82] 723 A.2d at 1190–92.

[83] 721 A.2d at 1283.

[84] 2005 WL 3529317, at *6.

successors) could redeem it.[85] The plaintiff asserted the dead-hand feature violated Section 141(a), and Vice Chancellor Jacobs agreed.[86] He found it reasonably conceivable that the dead-hand feature violated Section 141(a) because the provision "would jeopardize a newly-elected future board's ability to achieve a business combination by depriving that board of the power to redeem the pill without obtaining the consent of the 'Continuing Directors,'" which in turn "would interfere with the board's power to protect fully the corporation's (and its shareholders') interests in a transaction that is one of the most fundamental and important in the life of a business enterprise."[87]

Similar issues arose in *Quickturn II*, where a board defended against a hostile bid by adopting a rights plan that contained a delayed redemption provision.[88] That feature prevented any newly elected board from redeeming the rights for six months to facilitate a transaction with the hostile bidder.[89] Vice Chancellor Jacobs enjoined the deferred redemption provision on equitable grounds.[90] On appeal, the Delaware

---

[85] 723 A.2d at 1190–91.

[86] *Id.* at 1189.

[87] *Id.* at 1191

[88] 721 A.2d at 1287.

[89] *Id.*

[90] *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 728 A.2d 25, 44 (Del. Ch. 1998), *aff'd sub nom. Quickturn Design Sys., Inc. v. Shapiro*, 721 A.2d 1281 (Del. 1998).

Supreme Court held that the deferred redemption provision was invalid under

Section 141(a).[91] In the words of the decision,

> Section 141(a) requires that any limitation on the board's authority be set out in the certificate of incorporation. The Quickturn certificate of incorporation contains no provision purporting to limit the authority of the board in any way. The Delayed Redemption Provision, however, would prevent a newly elected board of directors from *completely* discharging its fundamental management duties to the corporation and its stockholders for six months. While the Delayed Redemption Provision limits the board of directors' authority in only one respect, the suspension of the Rights Plan, it nonetheless restricts the board's power in an area of fundamental importance to the shareholders—negotiating a possible sale of the corporation.[92]

The high court stressed that "to the extent that a contract, or a provision thereof, purports to require a board to act *or not act* in such a fashion as to limit the exercise of fiduciary duties, it is invalid and unenforceable."[93] The delayed redemption provision failed that test because it "tend[ed] to limit in a substantial way the freedom of newly elected directors' decisions on matters of management policy."[94]

---

[91] *Quickturn II*, 721 A.2d at 1291 ("According to Mentor, the Delayed Redemption Provision, like the 'dead hand' feature in the Rights Plan that was held to be invalid in *Toll Brothers,* will impermissibly deprive any newly elected board of both its statutory authority to manage the corporation under 8 *Del. C.* § 141(a) and its concomitant fiduciary duty pursuant to that statutory mandate. We agree." (footnote omitted)).

[92] *Id.* at 1291–92 (emphasis in original) (footnote omitted).

[93] *Id.* at 1292 (emphasis in original) (cleaned up).

[94] *Id.* (cleaned up). The Company has tried to reframe *Quickturn II* as a breach of fiduciary duty case, but the Delaware Supreme Court did not rule on that basis. *See Jones Apparel*, 883 A.2d at 852–53 (describing *Quickturn II* and *Toll Brothers* as "important decisions" which "reasoned that provisions limiting the ability of the board to redeem a rights plan were invalid in part because they were limitations on the authority of the board to manage the business and affairs of the corporation that were not set forth in the certificate of incorporation, as § 141(a) requires").

In *UniSuper,* after an Australian corporation proposed to reincorporate to Delaware, several major stockholders expressed concern about the board's ability to adopt a rights plan.[95] To mollify them, the board resolved that without stockholder approval, the directors would not adopt a rights plan with a duration longer than one year or renew a rights plan beyond one year.[96] After the reorganization closed, another entity acquired 17% of the corporation's stock.[97] The board adopted a rights plan and later extended it beyond one year without a stockholder vote.[98]

When stockholders sued to enforce the policy, the defendants argued that the policy could not constrain the board's authority under Section 141(a).[99] Chancellor Chandler refused to dismiss the claim, reasoning that the board policy gave power to the stockholders as a whole.[100] He stressed that "[t]he alleged agreement in this case enables a vote by all shareholders."[101] At the same time, he cautioned that "[p]rivate agreements between the board and a few large shareholders might be troubling where the agreements restrict the board's power in favor of a particular shareholder,

---

[95] 2005 WL 3529317, at *1.

[96] *Id.* at *3.

[97] *Id.*

[98] *Id.*

[99] *Id.* at *6.

[100] *Id.* at *6 n.49.

[101] *Id.*

rather than in favor of shareholders at large."[102] The Delaware Supreme Court

subsequently rejected that distinction. In *AFSCME*, the justices considered the

validity of a bylaw that restricted board authority and would only go into effect if the

stockholders approved it. The high court held: "That this limitation [on board

authority] would be imposed by a majority vote of the shareholders … does not, in our

view, legally matter."[103]

The rights plan decisions confirm that a direct, board-level restriction will not

survive simply because it appears in a third-party agreement. Technically, a rights

agreement is a contract with a rights agent. In substance, however, it is a control

---

[102] *Id.* In a later decision, Chancellor Chandler appeared to retreat from that qualification by rejecting a Section 141(a) challenge to a provision in a rights plan that prevented the board from applying the plan to a corporation's controlling stockholder. *In re InfoUSA Inc. S'holders Litig.*, 953 A.2d 963, 999 (Del. Ch. 2007). The *InfoUSA* decision relied exclusively on *Sample v. Morgan*, discussed below, and rested on the purported impossibility of distinguishing between governance arrangements and commercial contracts. *Id.* ("Every contract approved by a board of directors, after all, limits the discretion of the board in future transactions, but a board is empowered to make agreements with actors in commerce, including its own shareholders."). The decision did not cite or distinguish *Quickturn II*, *Toll Brothers,* or any of the other Section 141(a) cases. The weight of Section 141(a) authority indicates that when a corporation enters into governance arrangements with key stockholders, then Section 141(a) applies.

[103] *AFSCME*, 953 A.2d at 239. The high court made that observation when rejecting an attempt by the stockholder-proponents of the proposed bylaw to distinguish the rulings in *Quickturn II* and *QVC*. The stockholders-proponents contended that *Quickturn II* and *QVC* did not speak to a stockholder-adopted bylaw because both cases had "involved binding contractual arrangements that the board of directors had voluntarily imposed upon themselves." *Id.* The justices acknowledged the factual point, but held that "the distinction is one without a difference." *Id.* That was because "the internal governance contract—which here takes the form of a bylaw—is one that would also prevent the directors from exercising their full managerial power in circumstances where their fiduciary duties would otherwise require them to deny reimbursement to a dissident slate." *Id.* The same reasoning applies to *UniSuper*'s suggestion that it would make a difference that stockholders as a whole were voting on the rights plan.

45

device and functionally part of the entity-specific governance arrangement. The rights plan decisions also show yet again that a provision need not constrain a board entirely to give rise to a Section 141(a) violation. The dead-hand feature and the delayed redemption feature only affected the directors' power over takeover bids, yet they could not survive in the face of Section 141(a).

The *UniSuper* decision reinforces the lesson of *Chapin*. Although stockholders may rely on Section 141(a) to challenge a governance arrangement, as in this case, a board also can invoke Section 141(a) to protect its own decision-making authority. In *UniSuper*, that argument did not succeed at the pleading-stage, but the case still shows how the protection offered by Section 141(a) operates neutrally.

### c. CEO Employment Agreements: *Grimes* and *Politan*

The next two decisions involved employment agreements with CEOs. In both, the plaintiffs contended that the financial consequences of terminating the CEO were so great as to deprive the board of its ability to manage the corporation under Section 141(a). The *Grimes* decisions held that the complaint failed to plead facts supporting the necessary inference.[104] In *Politan*, the complaint contained the requisite allegations.[105]

The CEO's employment agreement in *Grimes* provided that if he determined in good faith that the board of directors had "unreasonably interfered with his

---

[104] *Grimes II*, 673 A.2d at 1214–15; *Grimes I*, 1995 WL 54441, at *11.

[105] *Politan Cap. Mgmt. LP v. Masimo Corp.*, C.A. No. 2022-0948-NAC, at 173–91 (Del. Ch. Feb. 3, 2023) (TRANSCRIPT).

management of the corporation," then he could declare his employment terminated and collect benefits totaling up to $20 million (the "No-Interference Condition").[106] A stockholder plaintiff challenged the employment agreement, contending that the No-Interference Condition constituted an abdication of the board's authority and the CEO's severance was so large that the board could not terminate him.[107]

Chancellor Allen recognized that a board "may not either *formally or effectively* abdicate its statutory power and its fiduciary duty to manage or direct the management of the business and affairs of this corporation."[108] He held that the No-Interference Provision did not formally restrict the board.[109] Although it was "unusual," "troubling," and "ill-conceived," he equated it with a poorly worded condition precedent for a CEO to declare a constructive termination.[110]

---

[106] *Grimes I*, 1995 WL 54441, at *1. There were actually three agreements, two of which triggered additional payments if the CEO declared that the board had unreasonably interfered with his managerial prerogatives. For simplicity, the discussion refers only to the employment agreement.

[107] *Id.* at *8–9.

[108] *Id.* at *9 (emphasis added).

[109] *Id.*

[110] *Id.* at *1; *see id.* at *11 ("Ultimately, it is the responsibility and duty of the elected board to determine corporate goals, to approve of strategies and plans to achieve those goals and to monitor progress towards achieving them. The insertion of the concept of board 'interference' into the employment contract of a senior officer clouds that responsibility; it addresses what may be a valid negotiating point—a senior officer's understandable desire that he be accorded substantial freedom in achieving goals set by the persons to whom he is accountable—in an unskillful way that raises problems.").

Chancellor Allen then considered whether the contractual consequences of termination were so great that the *"practical effect"* imposed an impermissible constraint.[111] After assuming it was possible, Chancellor Allen held that the plaintiff had not pled sufficient facts to state a claim given the financial strength of the corporation.[112]

The high court affirmed. The justices quoted the *Abercrombie* test with approval,[113] while stressing that ordinary commercial contracts do not violate Section 141(a):

> [B]usiness decisions are not an abdication of directorial authority merely because they limit a board's freedom of future action. A board which has decided to manufacture bricks has less freedom to decide to make bottles. In a world of scarcity, a decision to do one thing will commit a board to a certain course of action and make it costly and difficult (indeed, sometimes impossible) to change course and do another. This is an inevitable fact of life and is not an abdication of directorial duty.[114]

The justices thus made clear that something more is required for a Section 141(a) violation.

---

[111] *Id.* at *9.

[112] *Id.* at *11.

[113] *Grimes II*, 673 A.2d at 1214 (quoting *Abercrombie*, 123 A.2d at 899).

[114] *Id.* at 1214–15.

The Delaware Supreme Court agreed with Chancellor Allen that the plaintiff had not pled facts to support a *de facto* limitation on board authority based on the size of the severance payment.[115] The high court also observed that

> [i]f the market for senior management, in the business judgment of a board, demands significant severance packages, boards will inevitably limit their future range of action by entering into employment agreements. Large severance payments will deter boards, to some extent, from dismissing senior officers. If an independent and informed board, acting in good faith, determines that the services of a particular individual warrant large amounts of money, whether in the form of current salary or severance provisions, the board has made a business judgment.[116]

Where the consequence of breach is a financial one, the board generally "retains the ultimate freedom to direct the strategy and affairs of the Company."[117] The *Grimes* case involved "only a rather unusual contract, but not a case of abdication."[118]

*Politan* applied the same legal framework, but held that a plaintiff had pled a Section 141(a) violation. [119] The CEO's employment agreement stated that if only one-third of the board was replaced (amounting to two directors), then the CEO was entitled to severance worth as much as $1 billion.[120] The company faced a proxy contest, and the court found it reasonably conceivable that the threat of that

---

[115] *Id.* at 1214.

[116] *Id.* at 1215.

[117] *Id.*

[118] *Id.*

[119] *Politan*, C.A. No. 2022-0948-NAC, at 173–91.

[120] *Id.* at 170–71.

contractual consequence prevented the board from nominating new directors in response.[121] The challenge to those provisions therefore stated a claim under Section 141(a).[122]

The *Grimes* and *Politan* decisions demonstrate yet again that a Section 141(a) violation can arise from a contract and only involve one dimension of board authority. They also reinforce the distinction between a governance arrangement and a commercial contract. Most employment agreements are commercial contracts, but an agreement with a CEO implicates the internal division of authority between the board and the corporation's senior officer.[123]

### d. Improper Delegations: *Bally's*, *Clarke*, *Jackson*, *Nagy*, *Field*, and *ACE*

The largest cluster of decisions involve improper delegations of board authority.[124] Exercising its power under Section 141(a), a board can delegate duties to officers and employees.[125] But when directors delegate a core task to another and

---

[121] *Id.* at 172, 180–85.

[122] *Id.* at 173–91.

[123] *See* 8 *Del. C.* § 142(a) ("Every corporation organized under this chapter shall have such officers with such titles and duties as shall be stated in the bylaws or in a resolution of the board of directors which is not inconsistent with the bylaws and as may be necessary to enable it to sign instruments and stock certificates which comply with §§ 103(a)(2) and 158 of this title. One of the officers shall have the duty to record the proceedings of the meetings of the stockholders and directors in a book to be kept for that purpose.").

[124] *See generally* 2 William Meade Fletcher, *Fletcher Cyc. Corp.* § 496, Westlaw (database updated Sept. 2023) (collecting cases).

[125] *Grimes I*, 1995 WL 54441, at *8.

bind themselves to accept the result, then they have eliminated their ability to exercise their own judgment. That violates Section 141(a).[126]

---

[126] The DGCL reinforces the common law non-delegation doctrine by barring a board from delegating to an otherwise duly formed committee the power or authority to act concerning "(i) approving or adopting, or recommending to the stockholders, any action or matter (other than the election or removal of directors) expressly required by this chapter to be submitted to stockholders for approval or (ii) adopting, amending or repealing any bylaw of the corporation." 8 *Del. C.* § 141(c)(2). Not even a committee can exercise those powers on the board's behalf.

Many decisions have considered improper delegation claims.[127] A half-dozen are particularly pertinent: *Bally's*, *Clarke*,[128] *Jackson*,[129] *Nagy*,[130] *Field*,[131] and

---

[127] The cases reach fact-dependent outcomes. Some decisions have found that a plaintiff stated a claim. *See McMullin*, 765 A.2d at 924–25 (holding complaint stated claim that board improperly delegated to controlling stockholder the task of initiating, negotiating, and approving sale of the company); *In re Pattern Energy Gp. Inc. S'holders Litig.,* 2021 WL 1812674, *59–61 (Del. Ch. May 6, 2021) (holding complaint stated claim where directors allegedly delegated preparation of proxy statement to conflicted officers and did not review it before filing); *Rich v. Yu Kwai Chong*, 66 A.3d 963, 979 (Del. Ch. 2013) (holding complaint stated a claim where board failed to conduct meaningful investigation into demand letter and instead allowed management to make decisions without oversight); *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 278 (Del. Ch. 2003) (holding complaint stated claim where board failed to act on executive's compensation and abdicated decision-making responsibility to CEO); *In re Ply Gem Indus., Inc. S'holder Litig.*, 2001 WL 755133, at *10-11 (Del. Ch. June 26, 2001) (holding complaint stated claim that board improperly delegated task of negotiating merger agreement to CEO, chairman, and owner of more than 25% of the stock); *Sealy Mattress Co. of N.J. v. Sealy, Inc.*, 532 A.2d 1324, 1338 (Del. Ch. 1987) (holding that board "could not abdicate its obligation to make an informed decision on the fairness of the merger by simply deferring to the judgment of the controlling stockholder . . ."). Others have held that the facts alleged did not support the necessary inference. *See Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 127 (3d Cir. 1998) (applying Delaware law; rejecting improper delegation challenge where board delegated authority to administer and amend retirement benefits plan to corporate officer); *Aldina v. Intenet.com Corp.*, 2002 WL 31584292, at *7 (Del. Ch. Nov. 7, 2002) (dismissing claim that board improperly delegated task of conducting preliminary negotiation of transaction to CEO); *Emerald P'rs v. Berlin*, 2001 WL 115340, at *21 (Del. Ch. Feb. 7, 2001) (subsequent history omitted) (rejecting improper abdication claim where board delegated to financial advisor "the task of *recommending*—not deciding—the exchange ratio" and reserved for themselves the decision on what exchange ratio to adopt) (emphasis in original); *State of Wisconsin Inv. Bd. v. Bartlett*, 2000 WL 238026, at *4 (Del. Ch. Feb. 24, 2000) (rejecting improper delegation challenge to board's decision to allow CEO to lead merger negotiations); *Canal Cap. Corp. v. French*, 1992 WL 159008, at *3 (Del. Ch. July 2, 1992) (rejecting improper delegation challenge where board hired management firm to manage company's investments while retaining ability to fire manager by cancelling contract at any time); *Rosenblatt v. Getty Oil Co*, 1983 WL 8936, at *18 (Del. Ch. Sept. 19, 1983) (rejecting improper delegation challenge where parent and subsidiary corporations negotiating merger delegated tasks to engineering firm), *aff'd*, 493 A.2d 929, 943 (Del. 1985).

[128] *Clarke Mem'l Coll. v. Monaghan Land Co.*, 257 A.2d 234 (Del. Ch. 1969).

[129] *Jackson v. Turnbull*, 1994 WL 174668 (Del. Ch. Feb. 8, 1994), *aff'd*, 653 A.2d 306 (Del. 1994).

*ACE*.[132] Each considered the implications of a contract that constrained a board's ability to act by assigning a critical decision to someone else.[133]

In *Bally's*, a holding company granted a management company "uninterrupted control of and responsibility for the operation" of a casino, its sole asset.[134] The board retained the power to approve the annual budget, but its approval could not be unreasonably withheld. The board also had to approve any debt that exceeded the budget by $1 million, but that approval also could not be unreasonably withheld. Vice Chancellor Jacobs regarded the terms as so restrictive that "the directors have no power to initiate any action regarding the casino."[135] The directors also could not terminate the agreement unless the board first obtained "an opinion of counsel that a failure to terminate the contract would violate the board's fiduciary duties . . . ."[136] That last provision proved dispositive, because it meant that a lawyer, rather than

---

[130] *Nagy v. Bistricer*, 770 A.2d 43 (Del. Ch. 2000).

[131] *Field v. Carlisle Corp.*, 68 A.2d 817 (Del. Ch. 1949).

[132] *ACE Ltd. v. Cap. Re. Corp.*, 747 A.2d 95, 106 (Del. Ch. 1999).

[133] *See also Obeid v. Hogan*, 2016 WL 3356851, at *15 (Del. Ch. June 10, 2016) (holding that an attempt by a board to delegate the decision about what to do with a derivative claim to an officer or a non-director rather than to a properly constituted committee "would risk an improper abdication of authority"); *Carlson v. Hallinan*, 925 A.2d 506, 528 n.141 (Del. Ch. 2006) (noting without deciding that an agreement that an officer would serve "for life" could constitute a violation of Section 141(a)).

[134] *Bally's*, 1997 WL 305803, at *5.

[135] *Id.* at *6.

[136] *Id.*

the board, would determine whether the contract could be terminated.[137] Vice Chancellor Jacobs held that the stockholder plaintiff had stated a viable challenge to the management agreement under Section 141(a).[138]

In *Clarke*, a board authorized a corporation to explore selling all of its assets. But rather than determining whether to sell the corporation's assets or setting terms for the sale, the board authorized its President and Secretary to determine whether to sell and on what terms, as long as they secured a value in excess of a minimum price.[139] The court granted judgment on the pleadings for the plaintiff, finding the resolution resulted in an invalid delegation because "what the officers deem to be in the best interest of the Corporation is not necessarily what the Board of Directors may decide is in its best interest."[140]

In *Jackson*, the board approved a merger agreement that ensured stockholders would receive a specified amount per share in cash, then called for an appraisal that could result in more consideration.[141] Justice Berger, then a Vice Chancellor, held that this pricing structure constituted an improper delegation.[142] The appraisal

---

[137] *Id.*

[138] *Id.*

[139] *Clarke,* 257 A.2d at 240–41.

[140] *Id.* at 241.

[141] *Jackson*, 1994 WL 174668, at *1.

[142] *Id.* at *4–5.

provision bound the board to adopt the appraiser's decision, and the board's act in setting a minimum level of consideration was not enough.[143]

The *Nagy* decision was a virtual repeat of *Jackson*. A board approved a merger agreement that did not specify the consideration stockholders would receive, providing instead that the acquirer would determine the amount after consulting with a financial advisor. Chief Justice Strine, then serving as a Vice Chancellor, relied on *Jackson* to hold that by approving this mechanism, the board abdicated its duty to determine the merger consideration.[144]

The decisions in *Clarke*, *Jackson*, and *Nagy* each relied on *Field*, a pre-*Abercrombie* decision in which the board approved an agreement to issue stock to a third party in exchange for the third party's shares.[145] The board directed an appraiser to determine the exchange ratio, subject to a cap and a floor.[146] Chancellor Seitz, then serving as a Vice Chancellor, held that "the directors of a Delaware corporation may not delegate, except in such manner as may be explicitly provided by statute, the duty to determine the value of the property acquired as consideration

---

[143] *Id.* at \*5. The General Assembly responded to *Jackson* by amending Section 251. The statute now provides that a board can establish the amount of merger consideration by referring to "facts ascertainable" outside the merger agreement, including a person's determination. *See* 8 *Del. C.* § 251(b).

[144] *Nagy*, 770 A.2d at 46, 60–62.

[145] *Field*, 68 A.2d at 817.

[146] *Id.* at 818.

for the issuance of stock."[147] The corporation argued that the directors acted properly by setting an upper and lower bound, but Chancellor Seitz held that the directors must have the final say.[148] The appraisal provision violated Section 141(a) because "the directors bound their corporation even before seeing the appraisal . . . ."[149]

The *ACE* decision applied similar principles, and its holding resembled the outcome in *Bally's*. A target corporation entered into a merger agreement that prohibited its board from talking with potential third-party acquirers unless counsel opined that the board's fiduciary duties required engagement (the "No-Talk Provision").[150] When the target corporation tried to terminate the merger agreement to accept a higher bid, the incumbent buyer sought a temporary restraining order to block the termination, claiming the target violated the No-Talk Provision.[151] Writing as a Vice Chancellor, Chief Justice Strine denied the application, finding that the No-Talk Provision "is likely invalid."[152] He explained that the provision "involves an abdication by the board of its duty to determine what its own fiduciary obligations

---

[147] *Id.* at 818. The General Assembly responded by amending Section 151(a) The statute now makes clear that a board can set the consideration for a stock issuance by referring to "facts ascertainable" outside the resolution approving the issuance. *See* 8 *Del. C.* § 151(a).

[148] *Id.* at 820–21.

[149] *Id.* at 820.

[150] *ACE*, 747 A.2d at 106.

[151] *Id.* at 96–97.

[152] *Id.* at 97.

require at precisely that time in the life of the company when the board's own judgment is most important."[153] He cited *Jackson*, *Field*, *Quickturn II*, and Section 141(a).[154] Although he did not cite *Bally's*, Vice Chancellor Jacobs had reached the same conclusion in that decision regarding a similar termination provision in the management agreement at issue in that case.[155]

Taken together, the improper delegation cases demonstrate yet again that a third-party contract can violate Section 141(a). The decisions involved a management agreement (*Bally's*), an asset sale agreement (*Clarke*), a stock purchase agreement (*Field*), and merger agreements (*Jackson*, *Nagy*, and *ACE*). The decisions also confirm yet again that a restriction need not deprive a board of all of its authority to create a Section 141(a) problem. The decisions involved setting an amount of consideration (*Clarke*, *Field*, *Jackson*, and *Nagy*) or exercising a contractual termination right (*Bally's* and *ACE*).

The improper delegation decisions also confirm that improper limitations on board authority need not be framed expressly as board-level restrictions. In *Clarke*, *Field*, *Jackson*, and *Nagy*, the Section 141(a) problem stemmed from the board delegating a core function to someone else and agreeing to be bound by that person's determination. In *Bally's* and *ACE*, the Section 141(a) problem stemmed from the

---

[153] *Id.* at 106.

[154] *Id.* at 106 n.35 & 107 n.37.

[155] *Bally's*, 1997 WL 305803, at *6.

board agreeing not to terminate the agreement unless a lawyer satisfied a condition precedent by determining that the board's fiduciary duties required action. Corporate-level restrictions are sufficient to raise Section 141(a) issues.

### e. Merger Agreement Termination Rights: *QVC* and *Omnicare*

The next category of cases involves two decisions: *QVC* and *Omnicare*.[156] Each decision invalidated a provision in a merger agreement that limited the target directors' ability to fulfill their fiduciary duties by terminating the agreement to accept a higher offer. Both are primarily viewed as decisions about whether fiduciary duties trump contractual restrictions. The Section 141(a) jurisprudence suggests both should be viewed as rulings about when a provision in a merger agreement impermissibly limits the board's power, consistent with then-Vice Chancellor Strine's reasoning in *ACE*.[157]

In *QVC*, the merger agreement contained a suite of provisions that constrained the Paramount board from terminating the agreement to secure a better deal for the company's stockholders.[158] One was a no-shop provision.[159] Viacom, the acquirer,

---

[156] *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914 (Del. 2003).

[157] The *ACE* decision could fit in this category, because it too involved the termination of a merger agreement. 747 A.2d at 97. But the *ACE* decision relied on Section 141(a) expressly and found a violation because a lawyer had to opine that the board's fiduciary duties required it to terminate the agreement, which substituted the lawyer's judgment for the board's. The *ACE* decision therefore fits more readily with the improper delegation cases.

[158] *QVC,* 637 A.2d at 39.

[159] *Id.*

responded to a challenge to the provision by arguing that it had a vested contract right.[160] The high court disagreed:

> The No-Shop Provision could not validly define or limit the fiduciary duties of the Paramount directors. To the extent that a contract, or a provision thereof, purports to require a board to act or not act in such a fashion as to limit the exercise of fiduciary duties, it is invalid and unenforceable. Despite the arguments of Paramount and Viacom to the contrary, the Paramount directors could not contract away their fiduciary obligations. Since the No–Shop Provision was invalid, Viacom never had any vested contract rights in the provision.[161]

The decision as a whole evaluated whether the Paramount directors breached their fiduciary duties when selling Paramount.[162] Read in that context, the invalidation of the no-shop provision seemed to suggest that directors possessed a magical right to escape a contract if their fiduciary duties required it.

Delaware judges and practitioners engaged with that interpretation of *QVC* and explained why it could not hold water. Fiduciary status does not give directors "Houdini-like powers to escape from valid contracts."[163] In a less noticed (and less

---

[160] *Id.* at 50.

[161] *Id.* at 51 (citation omitted).

[162] *Id.* at 48–50.

[163] *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *23 (Del. Ch. Apr. 14, 2017) (collecting authorities); *see, e.g., Halifax Fund, L.P. v. Response USA, Inc.*, 1997 WL 33173241, at *2 (Del. Ch. May 13, 1997) ("[T]here is no Delaware case that holds that the management of a Delaware corporation has a fiduciary duty that overrides and, therefore, permits the corporation to breach, its contractual obligations."); *Corwin v. DeTrey*, 1989 WL 146231, at *4 (Del. Ch. Dec. 4, 1989) ("[T]he directors of the selling corporation are not free to terminate an otherwise binding merger agreement just because they are fiduciaries and circumstances have changed.").

criticized) aspect of *Smith v. Van Gorkom*,[164] the Delaware Supreme Court held that

the fiduciaries who had entered into a merger agreement did not have the ability to

disregard its terms.[165] Only if the directors breached their fiduciary duties *when*

---

[164] 488 A.2d 858 (Del. 1985). This opinion omits *Van Gorkom*'s subsequent history, which is convoluted and potentially misleading. Strict rules of citation call for identifying *Van Gorkom* as having been overruled in part by *Gantler v. Stephens*, 965 A.2d 695 (Del. 2009). That case responded to *Van Gorkom*'s loose use of the term "ratification" to refer to the effect of an organic stockholder vote contemplated by the DGCL. The Delaware Supreme Court limited the use of the term "ratification" to its "classic" sense, namely situations where one decision-maker has made a decision unilaterally. 965 A.2d at 713. The decision overruled *Van Gorkom* to the extent the earlier case used the term "ratification" to refer to an organic vote called for by the DGCL. *See id.* at 713 n.54. Other than on this narrow point of terminology, *Gantler* did not overrule *Van Gorkom*. Unfortunately, *Gantler*'s attempt to correct the terminology used in *Van Gorkom* created the misimpression that the case had worked a broader change in Delaware law. The Delaware Supreme Court has held subsequently that *Gantler* did not have this broader consequence. *See Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 311 (Del. 2015). It muddies the waters to cite *Gantler* as having overruled *Van Gorkom* in part, both because *Gantler* only sought to clarify a point of terminology and because *Corwin* subsequently made clear that *Gantler* did not "unsettle a long-standing body of case law." *Id.*

[165] *See Van Gorkom*, 488 A.2d at 888; s*ee, e.g.,* William T. Allen, *Understanding Fiduciary Outs: The What and the Why of an Anomalous Concept*, 55 Bus. Law. 653, 654 (2000) ("One of the holdings of the Delaware Supreme Court in *Smith v. Van Gorkom* was that corporate directors have no fiduciary right (as opposed to power) to breach a contract." (footnotes omitted)); R. Franklin Balotti & A. Gilchrist Sparks, III, *Deal-Protection Measures and the Merger Recommendation*, 96 Nw. U. L. Rev. 467, 468–69 (2002) ("In *Smith v. Van Gorkom*, the Delaware Supreme Court established that Delaware law does not give directors, just because they are fiduciaries, the right to accept better offers, distribute information to potential new bidders, or change their recommendation with respect to a merger agreement even if circumstances have changed." (footnote omitted)); John F. Johnston, *Recent Amendments to the Merger Sections of the DGCL Will Eliminate Some—But Not All— Fiduciary Out Negotiation and Drafting Issues*, 1 Mergers & Acquisitions L. Rep. 20, 777, 778 (July 20, 1998) (BNA) ("[T]here is . . . no public policy that permits fiduciaries to terminate an otherwise binding agreement because a better deal has come along, or circumstances have changed"); John F. Johnston & Frederick H. Alexander, *Fiduciary Outs and Exclusive Merger Agreements—Delaware Law and Practice*, 11 Insights No. 2, 15, 15 (Feb. 1997) ("[T]he Delaware Supreme Court held that directors of Delaware corporations may not rely on their status as fiduciaries as a basis for (1) terminating a merger agreement due to changed circumstances, including a better offer; or (2) negotiating with other bidders in order to develop a competing offer."); A. Gilchrist Sparks, III, *Merger Agreements Under Delaware Law—When Can Directors Change Their Minds?*, 51 U. Miami L. Rev. 815, 817

*entering into a contract* does it become possible to invalidate it on fiduciary grounds.[166]

A fiduciary analysis, however, only involves the second dimension of Professor Berle's twice-tested framework. According to his famous formulation,

> in every case, corporate action must be twice tested: first, by the technical rules having to do with the existence and proper exercise of the power; second, by equitable rules somewhat analogous to those which apply in favor of a *cestui que trust* to the trustee's exercise of wide powers granted to him in the instrument making him a fiduciary.[167]

Delaware follows the twice-tested rubric.[168] The *QVC* decision could have invalidated the no-shop clause under either the first inquiry (Berle I) or the second (Berle II).

---

(1997) ("[*Van Gorkom*] makes it clear that under Delaware law there is no implied fiduciary out or trump card permitting a board to terminate a merger agreement before it is sent to a stockholder vote."). One decision speculates in *dictum* that *Omnicare* might have overruled *Van Gorkom* on this point, but it does not endorse or expound on that view. *See In re OPENLANE, Inc. S'holders Litig.*, 2011 WL 4599662, at *10 n.53 (Del. Ch. Sept. 30, 2011) ("*Omnicare* may be read to say that there must be a fiduciary out in every merger agreement."). As I have explained at length elsewhere, *Omnicare* did not overrule *Van Gorkom*'s holding about the relationship between contracts and fiduciary duty claims. *See generally* J. Travis Laster, Omnicare's *Silver Lining*, 38 J. Corp. L. 795, 818–27 (2013) [hereinafter *Silver Lining*].

[166] *See C & J Energy Servs., Inc. v. Miami Gen. Empls.'*, 107 A.3d 1049, 1072 (Del. 2014) (instructing trial courts not to divest third parties of their contract rights absent a sufficient showing that the contract resulted from a fiduciary breach and that the counterparty aided and abetted the breach); *WaveDivision Hldgs., LLC v. Millennium Dig. Media Sys.*, 2010 WL 3706624, at *17 (Del. Ch. Sept. 17, 2010).

[167] Adolf A. Berle, Jr., *Corporate Powers as Powers in Trust*, 44 Harv. L. Rev. 1049, 1049 (1931).

[168] *Coster v. UIP Cos., Inc.*, 255 A.3d 952, 960 (Del. 2021); *Bäcker v. Palisades Growth Cap. II, L.P.*, 246 A.3d 81, 96 (Del. 2021); *In re Invs. Bancorp., Inc. S'holder Litig.*, 177 A.3d 1208, 1222 (Del. 2017).

In hindsight, *QVC*'s observation that "the Paramount directors could not contract away their fiduciary obligations"[169] suggests a Berle I violation of Section 141(a). After all, where do directors' fiduciary duties come from? Under Delaware law, they accompany the plenary authority that Section 141(a) confers on the board.[170] Saying that a contract prevents a board from fulfilling its fiduciary duties is another way of describing a constraint on the board's powers under Section 141(a).

Interpretating that aspect of *QVC* as resting on a Section 141(a) violation finds support in the Restatement (Second) of Contracts, which states that "[a] promise by a fiduciary to violate his fiduciary duty or a promise that tends to induce such a violation is unenforceable on grounds of public policy."[171] Note that the promise is *not*

---

[169] *QVC,* 637 A.2d at 51.

[170] *E.g.*, *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1993) ("Our starting point is the fundamental principle of Delaware law that the business and affairs of a corporation are managed by or under the direction of its board of directors. 8 Del. C. § 141(a). In exercising these powers, directors are charged with an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders."), *decision modified on reargument on other grounds*, 636 A.2d 956 (Del. 1994); *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) ("It is basic to our law that the board of directors has the ultimate responsibility for managing the business and affairs of a corporation. 8 *Del. C.* § 141(a). In discharging this function, the directors owe fiduciary duties of care and loyalty to the corporation and its shareholders."); *Revlon*, 506 A.2d at 179 ("The ultimate responsibility for managing the business and affairs of a corporation falls on its board of directors. 8 *Del. C.* § 141(a). In discharging this function the directors owe fiduciary duties of care and loyalty to the corporation and its shareholders." (footnote omitted)); *Aronson*, 473 A.2d at 811 ("The existence and exercise of [the board's authority under Section 141(a)] carries with it certain fundamental fiduciary obligations to the corporation and its shareholders."); *see also Quickturn II*, 721 A.2d at 1291 (citing the board's "statutory authority to manage the corporation under 8 *Del. C.* § 141(a) and its concomitant fiduciary duty pursuant to that statutory mandate").

[171] Restatement (Second) of Contracts § 193 (Am. L. Inst. 1981), Westlaw (database updated Oct. 2023).

unenforceable because it arises from a fiduciary breach. The promise is unenforceable because it violates public policy. The Restatement explains that the rule extends to controlling stockholders when voting and, as an illustration, offers the following: "A sells all of his shares of stock in a corporation to B, who pays the price and promises to exercise his voting power in accordance with A's instructions. B's promise is one to violate a fiduciary duty and is unenforceable on grounds of public policy."[172] If a director made the same agreement, it would be a classic Section 141(a) violation.

This decision is not the first to identify Section 141(a) as the source for *QVC*'s no-vested-contract-rights holding. In *AFSCME*, the Delaware Supreme Court interpreted *QVC* the same way, explaining that the no-shop clause "prevent[ed] the directors from exercising their full managerial power" by giving a pre-approval right to the incumbent buyer.[173]

That brings us to the controversial *Omnicare* decision. There, a target board entered into a merger agreement with a force-the-vote provision and no right to terminate the merger agreement to accept a higher bid.[174] When the board approved the merger agreement, the directors knew that the company's two senior officers held high-vote stock carrying a majority of the outstanding voting power and would be

---

[172] *Id.* illus. 2.

[173] *AFSCME*, 953 A.2d at 239.

[174] *Omnicare*, 818 A.2d at 925–26.

entering into voting agreements with the buyer that made the merger vote a foregone conclusion.[175]

After a competing bidder emerged, a class of stockholders challenged the combination of a force-the-vote provision, no termination right, and majority-voting power lockups.[176] The plaintiffs contended that the combination both constituted a breach of fiduciary duty and was invalid under Section 141(a).[177]

The majority opinion agreed on both points. The majority analyzed the combination through a fiduciary duty lens and held that the combination was preclusive and therefore failed enhanced scrutiny.[178] As an alternative basis for its holding, the high court held that the combination of provisions was unenforceable because it "completely prevented the board from discharging its fiduciary responsibilities to the minority stockholders when Omnicare presented its superior transaction."[179] For support, the court cited *QVC* and Section 193 of the Restatement.[180]

Although the majority did not cite Section 141(a) explicitly, that provision was the foundation of the plaintiffs' argument. The Court of Chancery thought it was

---

[175] *Id.* at 925.

[176] *Id.* at 919.

[177] *See id.* at 936–37.

[178] *Id.* at 936.

[179] *Id.*

[180] *Id.* at 936 n.74.

"simply nonsensical to say that a board of directors abdicates its duties to manage the 'business and affairs' of a corporation under Section 141(a) of the DGCL by agreeing to the inclusion in a merger agreement of a term authorized by § 251(c) of the same statute."[181] The Delaware Supreme Court majority disagreed, holding that although a force-the-vote provision might be permissible in the abstract, it operated in conjunction with the voting agreements to prevent the board from exercising a core aspect of its managerial power.[182] The majority held that the board needed to bargain for an effective fiduciary out to ensure that it could continue to fulfill its fiduciary duties.[183]

---

[181] *Id.* at 936.

[182] *Id.* at 937–38.

[183] *Id.* at 939.

Common wisdom views *Omnicare* as a punching bag.[184] I have suggested that it's more of a mixed bag.[185] Other commentators have also cited positive aspects of the opinion.[186] For present purposes, *Omnicare* is helpful because it provides additional insight into Section 141(a). The improper delegation decisions establish

---

[184] *See, e.g.*, Andrew D. Arons, *In Defense of Defensive Devices: How Delaware Discouraged Preventative Measures in* Omnicare v. NCS Healthcare, 3 DePaul Bus. & Com. L.J. 105, 120–21 (2004) ("The [*Omnicare*] majority's decision was incorrect because NCS' board's actions did in fact satisfy Delaware law, the majority misapplied the applicable law, and other jurisdictions lend support against the majority's holding."); Eleonora Gerasimchuk, *Stretching the Limits of Deal Protection Devices: From* Omnicare *to* Wachovia, 15 Fordham J. Corp. & Fin. L. 685, 704 (2010) ("As a matter of policy, the *Omnicare* majority was correctly criticized for announcing a per se rule that seemed to exceed the Delaware courts' traditional equitable authority and tended toward quasi-legislative lawmaking."); Wayne O. Hanewicz, *Director Primacy, Omnicare, and the Function of Corporate Law*, 71 Tenn. L. Rev. 511, 556–58 (2004) (describing "problems" with *Omnicare* and stating it "may well be that [the court] made the wrong substantive decision . . ."); Thanos Panagopoulos, *Thinking Inside the Box: Analyzing Judicial Scrutiny of Deal Protection Devices in Delaware*, 3 Berkeley Bus. L.J. 437, 466–68 (2006) (arguing the Delaware Supreme Court "[e]rred in *Omnicare*" and inappropriately relied on the "unfounded" principle that a board has "a fiduciary duty to protect minority stockholders" from "the will of the majority"); Daniel Vinish, *The Demise of Clarity in Corporate Takeover Jurisprudence: The* Omnicare v. NCS Healthcare *Anomaly*, 21 St. John's J. Legal Comment. 311, 312 (2006) ("[In *Omnicare*], the Delaware Supreme Court destroyed the prior lucidity in case law governing corporate directors by holding . . . that an amalgam of stockholder and director action may be taken into account" in enhanced scrutiny and that a fiduciary out "would now be imposed on director action . . . . ").

[185] *See Silver Lining*, *supra*, at 796 (arguing that "like people, problems, and broken hearts, *Omnicare* isn't all bad" and that "[a]lthough saying anything good about *Omnicare* smacks of heresy, four aspects of the decision deserve positive reinforcement.").

[186] *See, e.g.*, Stephen J. Lubben, *The Board's Duty to Keep Its Options Open*, 2015 U. Ill. L. Rev. 817, 824–26 (2015) (acknowledging that *Omnicare* is a puzzling and opaque decision; interpreting its core holding as requiring boards to keep options open); Megan Wischmeier Shaner, *How "Bad Law, Bad Economics and Bad Policy" Positively Shaped Corporate Behavior*, 47 Akron L. Rev. 753 (2014) (collecting criticisms of *Omnicare*, showing that the predicted negative consequences have not come to pass, and identifying positive features of decision); Brian J.M. Quinn, *Bulletproof: Mandatory Rules for Deal Protection*, 32 J. Corp. L. 865, 885 (2007) (arguing that regardless of theoretical and doctrinal weaknesses in its decision, *Omnicare* reached the right policy result by limiting fully locked-up transactions).

that Section 141(a) applies to merger agreements—or more properly to the internal affairs aspects of merger agreements. Viewed through a Section 141(a) lens, *QVC* and *Omnicare* extended the scope of that section to provisions governing the target board's ability to terminate a merger agreement to obtain a better offer for the corporation's stockholders, thereby foreshadowing (*QVC*) and emulating (*Omnicare*) then-Vice Chancellor Strine's decision in *ACE*. That move was and remains contestable. On the one hand, a provision limiting the board's ability to terminate a deal to accept a better transaction for stockholders seems to implicate internal affairs issues and hence is subject to Section 141(a). On the other hand, it is just as easy to see a termination provision as primarily implicating the rights of the third-party bidder and hence more akin to an external commercial contract.

Regardless of whether one agrees or disagrees with *QVC* and *Omnicare*, the decisions underscore the difference between internally focused governance provisions and externally focused commercial provisions. Some agreements include both. The DGCL expressly authorizes merger agreements and spells out what they must address, evidencing that merger agreements affect a corporation's internal affairs.[187] A merger agreement that failed to address the statutorily required items would be invalid under the DGCL. The improper delegation cases involving merger agreements (*Jackson*, *Nagy*, and *ACE*) confirm that Section 141(a) governs the internally focused governance aspects of those agreements. But merger agreements also incorporate

---

[187] *E.g.*, 8 *Del. C.* § 141(a); 8 *Del. C.* § 251.

provisions governing the commercial relationship between seller and buyer. The resulting line-drawing problem involves determining where the internal affairs dimension ends and the external commercial dimension begins. The *QVC* and *Omnicare* decisions were controversial because they addressed the contestable space between those domains. The cases also show that the need for some degree of line-drawing is unavoidable.

### f. Bylaws: *AFSCME* and *Gorman*

The next to last category consists of two cases addressing corporate bylaws: *AFSCME* and *Gorman*.[188] Bylaws are inherently part of a corporation's internal governance arrangement, so Section 141(a) naturally applies.[189] Delaware law also interprets bylaws as a contract to which the stockholders are parties,[190] so bylaws present the same issues of contractual power. The bylaw cases thus offer unique insights into what a contractual restriction on board authority can achieve. The bylaw

---

[188] *Gorman v. Salamone*, 2015 WL 4719681 (Del. Ch. July 31, 2015).

[189] *See Quadrant Structured Prods. Co. v. Vertin*, 2014 WL 5465535, at *3 (Del. Ch. Oct. 28, 2014) ("When evaluating corporate action for legal compliance, a court examines whether the action contravenes the hierarchical components of the entity-specific corporate contract, comprising (i) the Delaware General Corporation Law, (ii) the corporation's charter, (iii) its bylaws, and (iv) *other entity-specific contractual agreements*, such as a stock option plan, other equity compensation plan, or, as to the parties to it, a stockholder agreement." (emphasis added)).

[190] *Boilermakers Loc. 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 939 (Del. Ch. 2013) ("As our Supreme Court has made clear, the bylaws of a Delaware corporation constitute part of a binding broader contract among the directors, officers, and stockholders formed within the statutory framework of the DGCL." (citing *Airgas, Inc. v. Air Prods. & Chems., Inc.*, 8 A.3d 1182, 1188 (Del.2010), *and Lawson v. Household Fin. Corp.*, 152 A. 723, 726 (Del.1930))).

cases also reveal how corporations rely on Section 141(a) to defend against incursions into the board's decision-making space.

In *AFSCME*, an institutional investor submitted a proposal for a bylaw that would require reimbursement for a stockholder's reasonable expenses incurred in nominating one or more candidates for election to the board, as long as the stockholder did not seek to elect a majority slate and at least one of the candidates was elected.[191] The corporation asked the SEC for a no-action letter confirming that the corporation could exclude the proposal from its proxy statement. The SEC certified two questions to the Delaware Supreme Court. First, "[i]s the AFSCME Proposal a proper subject for action by shareholders as a matter of Delaware law?"[192] Second, "[w]ould the AFSCME Proposal, if adopted, cause [the corporation] to violate any Delaware law to which it is subject?"[193]

To answer the first question, the justices considered whether stockholders could enact bylaws that limited board authority under Section 141(a).[194] The Delaware Supreme Court explained that "stockholders of a corporation subject to the DGCL may not directly manage the business and affairs of the corporation, at least without specific authorization in either the statute or the certificate of

---

[191] *AFSCME*, 953 A.2d at 230.

[192] *Id.* at 231.

[193] *Id.*

[194] *Id.* at 232.

incorporation."[195] In light of the board's managerial authority, the Delaware Supreme Court held that the stockholders' power to adopt bylaws is "limited by the board's management prerogatives under Section 141(a)."[196]

That meant the Delaware Supreme Court had to determine whether the bylaw limited the board's managerial prerogatives. Focusing on the nature of bylaws generally, the Delaware Supreme Court held that "a proper function of bylaws is not to mandate how the board should decide specific substantive business decisions, but rather, to define the process and procedures by which those decisions are made."[197] Applying this principle, the court explained that a bylaw would be valid if it "establishes or regulates a process for substantive director decision-making," but not "one that mandates the decision itself."[198]

The Delaware Supreme Court then turned to the second question. As in *QVC* and *Omnicare*, the *AFSCME* decision framed the issue in terms of the directors' ability to fulfill their fiduciary duties.[199] In doing so, however, the justices expressly relied on Section 141(a) precedents and held that the bylaw, "as drafted, would violate the prohibition, which our decisions have derived from Section 141(a), against

---

[195] *Id.*

[196] *Id.*

[197] *Id.* at 234–35.

[198] *Id.* at 235.

[199] *Id.* at 238.

contractual arrangements that commit the board of directors to a course of action that would preclude them from fully discharging their fiduciary duties to the corporation and its shareholders."[200] The justices thus confirmed that Section 141(a) is the throughline connecting *QVC*, *Quickturn II*, and *AFSCME*.

The Delaware Supreme Court held that the *AFSCME* provision was facially invalid because it would "prevent the directors from exercising their full managerial power in circumstances where their fiduciary duties would otherwise require them to deny reimbursement to a dissident slate."[201] The bylaw could not operate legitimately because if the directors already believed that reimbursement was in the best interests of the corporation, then they would approve the reimbursement irrespective of the bylaw. The only scenario in which the bylaw could ever be enforced would be if the directors believed that expenses should not be reimbursed, at which point enforcement would violate Section 141(a).

In *Gorman*, this court relied on *AFSCME* to invalidate a bylaw that allowed stockholders to remove the incumbent CEO and appoint his successor.[202] Section 142(b) of the DGCL addresses the selection and removal of officers and states:

---

[200] *Id.* at 238 & n.26 (citing *Quickturn II* and *QVC*).

[201] *Id.* at 239. Since 2009, the provision at issue in *AFSCME* has been valid in light of the adoption of Section 113 of the DGCL, which states that "[t]he bylaws may provide for the reimbursement by the corporation of expenses incurred by a stockholder in soliciting proxies in connection with an election of directors . . . ." 8 *Del. C.* § 113(a); *see* 77 Del. Laws c. 14 § 2 (2009). For purposes of Section 141(a), Section 113(a) is an example of a limitation that may be imposed "as may be otherwise provided in this chapter . . . ." 8 *Del. C.* § 141(a).

[202] *Gorman*, 2015 WL 4719681, at *4.

Officers shall be chosen in such manner and shall hold their offices for such terms as are prescribed by the bylaws or determined by the board of directors or other governing body. Each officer shall hold office until such officer's successor is elected and qualified or until such officer's earlier resignation or removal.[203]

Section 142(e) addresses the filling of vacancies and states: "Any vacancy occurring in any office of the corporation by death, resignation, removal or otherwise, shall be filled as the bylaws provide. In the absence of such provision, the vacancy shall be filled by the board of directors or other governing body."[204]

Under the plain language of Section 142, one might think that the DGCL had authorized a bylaw under which stockholders could remove an officer and fill the resulting vacancy. The holders of a majority of the voting power thought so, and they acted by written consent to enact such a bylaw, then removed and replaced the CEO.[205] The CEO disputed his removal, contending that the bylaw impermissibly limited the board's authority under 141(a).

The court agreed with the CEO. Quoting from *AFSCME*, the court held that stockholders "may not directly manage the business and affairs of the corporation, at least without specific authorization in either the statute or the certificate of incorporation."[206] Again quoting from *AFSCME*, the court held that bylaws "may not

---

[203] 8 *Del. C.* § 142(b).

[204] *Id.* § 142(e).

[205] *Gorman*, 2015 WL 4719681, at *2.

[206] *Id.* at *5 (quoting *AFSCME*, 953 A.2d at 232).

'mandate how the board should decide specific substantive business decisions . . . .'"[207] The court reasoned that "[a] primary way by which a corporate board manages a company is by exercising its independently informed judgment regarding who should conduct the company's daily business."[208] The court concluded that giving the stockholders the right to remove officers "would unduly constrain the board's ability to manage the Company."[209]

Those outcomes fit with the rest of the Section 141(a) canon. The bylaw provisions are part of the internal governance arrangement, so Section 141(a) applies. A restriction need not constrain the board in exercising all of its powers; a constraint in a single area can be enough. And like *UniSuper* and *Chapin*, both *AFSCME* and *Gorman* offer examples of companies relying on Section 141(a) to defend against a threatened constraint on a board's authority. Section 141(a) is not a one-way limitation on private ordering that only stockholder plaintiffs invoke when on offense. Section 141(a) is also a protection against restrictions on board authority that corporations use on defense.

---

[207] *Id.* (quoting *AFSCME*, 953 A.2d at 232).

[208] *Id.*

[209] *Id.* at *6.

### g. *Sample*

The last category involves just one decision: *Sample*. That opinion primarily addressed breaches of fiduciary duty, but it ruled on one Section 141(a) claim. In the course of dismissing it, the court argued for rejecting the Section 141(a) canon.

The *Sample* plaintiff challenged self-interested actions by a company's top three executive officers, who also comprised a majority of its five-member board.[210] The board solicited and obtained stockholder approval for (i) a charter amendment that increased the company's outstanding shares by 46% and (ii) a management compensation plan that would allow the shares to be used to recruit and retain management.[211] After securing the favorable stockholder vote, a special committee granted all of the newly authorized shares to the three officers.[212]

The company's disclosures did not mention the plan to issue the shares to the officers.[213] They also did not discuss a sale of stock by the company's largest blockholder, who held a 29% stake, to a buyer who already held a 6.8% stake.[214] The seller had asked the company to make representations to the buyer to facilitate the sale.[215] The company both gave the representations and covenanted to the buyer that

---

[210] *Sample*, 914 A.2d at 650–51.

[211] *Id.*

[212] *Id.* at 650–51.

[213] *Id.* at 651.

[214] *Id.* at 655.

[215] *Id.* at 656.

the company would not issue any additional capital stock for a period of five years without the buyer's consent (the "Equity Capital Restriction").[216]

The plaintiff contended that the officers designed and implemented the interested transactions to ensure that they held a dominant block for five years.[217] That block would both entrench management against threats and give them a control position to sell for a premium. But the plaintiff also challenged the Equity Capital Restriction as a violation of Section 141(a).[218]

The defendants moved to dismiss the complaint under Rule 12(b)(6). While denying the rest of the motion as frivolous, the court granted the motion as to the Section 141(a) challenge. Echoing *Grimes*, the *Sample* court began by stressing that the restrictions that come from entering into a contract do not violate Section 141(a):

> If a board enters into a five-year exclusive agreement to purchase energy, that necessarily limits its freedom to manage its procurement of energy. But that does not mean that the board has "abdicated" its authority to manage, it means that the board has exercised its authority.[219]

The court then theorized that the Equity Capital Restriction was likely a common provision that a buyer might demand to protect against dilution.[220] That led the court

---

[216] *Id.*

[217] *Id.* at 660–61.

[218] *Id.* at 661.

[219] *Id.* at 671–72 (footnotes omitted).

[220] *Id.* at 672.

to conclude that a buyer might pay more to receive that protection, such that a company should be able to grant that protection "to obtain a higher price from buyers to the net benefit of the corporation."[221] Those are fair points, but they do not grapple with the essence of a Section 141(a) claim. That species of claim recognizes that under the DGCL, some limitations on board authority go too far, even if a counterparty might want it and the board might be willing to grant it.

In a footnote, the *Sample* court sought to distinguish the plaintiff's "so-called 'abdication' authority" as envisioning "a more extreme situation when the directors can be thought to have given away to a third-party powers that are so crucial to management that the directors are essentially no longer in control of the corporation."[222] As examples, the court cited *Abercrombie*, *Grimes II*, and *Quickturn II*. The agents agreement in *Abercrombie* was so encompassing that it could fairly be described as leaving the directors no longer in control of the corporation.[223] But neither *Grimes* nor *Quickturn II* involved anything of that sort. The *Grimes* decisions involved CEO severance compensation.[224] The *Quickturn II* decision only involved the redemption of a rights plan.[225] As demonstrated by the survey of Section 141(a) cases,

---

[221] *Id.*

[222] *Id.* at 672 n.77.

[223] 123 A.2d at 897–99.

[224] *Grimes II*, 673 A.2d at 1214–15; *Grimes I*, 1995 WL 54441, at *11.

[225] *Quickturn II*, 721 A.2d at 1291.

the vast majority of those decisions only involve specific issues; they do not involve boards giving up authority altogether. But based on the contrary assertion that Section 141(a) claims involve scenarios where directors "are essentially no longer in control of the corporation," the footnote characterized the Equity Capital Restriction as "far-removed from that unusual context."[226]

The *Sample* decision then argued for jettisoning Section 141(a) review for corporate contracts. After acknowledging Professor Berle's two-part test,[227] the court asserted "[r]ather than condemn[ing] such exercises in contracting as illegal, Delaware law uses equity, in the form of principles of fiduciary duty, to ensure that directors do not injure their corporations."[228]

That assertion does not account for the many decisions that have ruled on Section 141(a) challenges to corporate contracts. As a practical matter, it would result in Delaware courts only applying the second part of Professor Berle's two-part test to corporate contracts. Rather than twice-tested, they would be once-tested.

In a second footnote, the *Sample* decision went further:

I understand that certain Supreme Court decisions have purported to address board decisions that limit the future flexibility of the board in a starker manner, reflecting a view that such decisions were illegal, not just inequitable. The decision in [*Quickturn II*], involving a board's unilateral adoption of a slow-hand poison pill, is an example. But it is easy to reach the same result—namely, a holding that a slow-hand

---

[226] *Sample,* 914 A.2d at 672 n.77.

[227] *Id.* at 672 (agreeing that "[c]orporate acts thus must be 'twice-tested'—once by the law and again by equity").

[228] *Id.* at 672.

poison pill should be condemned—employing the more nuanced tool of equity. Certainly, that is rather obviously the case in the more extreme instance of a dead-hand poison pill, the only equitable justifications of which would seem to reside in sentiments commonly expressed by dictators seeking to justify their retention of permanent authority in the face of electoral risk (i.e., only they can protect the citizenry). The more controversial majority decision in [*Omnicare*], also condemned as per se invalid certain actions. But that was in part precisely the reason that the decision was so controversial and drew two well-reasoned dissents. Those actions were specifically authorized by statute and therefore could not be condemned except on equitable grounds.

For present purposes, it is worth noting that both of these decisions were rendered in cases involving board conduct in the mergers and acquisitions context, in which the concern arises that directors may seek to restrict their own authority (or that of their successors) in order to retain control or favor a particular bidder. The Delaware General Corporation Law does not contain provisions that prevent directors from entering into contracts with [third parties] for legitimate reasons simply because those contracts necessarily impinge on the directors' future freedom to act. If the judiciary invented such a per se rule, directors would be rendered unable to manage, because they would not have the requisite authority to cause the corporation to enter into credible commitments with other actors in commerce.[229]

The court thus characterized *Quickturn II* and *Omnicare* as aberrational, implicitly sullying other Section 141(a) decisions as well.[230]

The second footnote used *Quickturn II* and *Omnicare* to set up a strawman. The footnote observed that the DGCL "does not contain provisions that prevent

---

[229] *Id.* at 672 n.79.

[230] *But see Jones Apparel*, 883 A.2d at 852–53 (describing *Quickturn II* and *Toll Brothers* as "important decisions" which "reasoned that provisions limiting the ability of the board to redeem a rights plan were invalid in part because they were limitations on the authority of the board to manage the business and affairs of the corporation that were not set forth in the certificate of incorporation, as § 141(a) requires"); *but see also Nagy,* 770 A.2d at 62 n.51 (invoking the "fundamental principles that supported the Delaware Supreme Court's invalidation of the so-called 'slow-hand' poison pill in *Quickturn . . .*").

directors from entering into contracts with [third parties] for legitimate reasons simply because those contracts necessarily impinge on the directors' future freedom to act."[231] It then posited that if such a rule existed, then "directors would be rendered unable to manage, because they would not have the requisite authority to cause the corporation to enter into credible commitments with other actors in commerce."[232]

Both statements are true. Neither captures the nature of a Section 141(a) violation. None of the Section 141(a) precedents suggest that a violation exists whenever directors enter into contracts with third parties "for legitimate reasons simply because those contracts necessarily impinge on the directors' future freedom to act." In fact, *Grimes II* said exactly the opposite.[233] Nor does applying Section 141(a) to internal governance arrangements leave a board "unable to manage." Instead, Section 141(a) protects a board's ability to manage the corporation by making clear that internal governance constraints are invalid unless they appear in the charter.[234] The actual Section 141(a) precedents leave intact the corporation's power to enter into credible commitments through commercial contracts.

The *Sample* decision thus stands alone and on dubious ground in arguing for eliminating Section 141(a) challenges to corporate contracts. The weight of the

---

[231] *Sample*, 914 A.2d at 672 n.79.

[232] *Id.*

[233] 673 A.2d at 1214–15.

[234] In this respect, the Section 141(a) limitation operates as a pre-commitment rule by making particularly onerous constraints off limits. *See Silver Lining*, *supra*, at 827–33.

Section 141(a) precedents, including the Delaware Supreme Court's decisions in *AFSCME*, *Quickturn II*, and *Grimes II*, supports the viability of those challenges. If read as Section 141(a) cases, the Delaware Supreme Court's decisions in *QVC* and *Omnicare* support those challenges as well. The Delaware Supreme Court's decisions are controlling.

## 2. Lessons From The Decisions

The review of Section 141(a) decisions reveals a two-step inquiry. The cases do not leap to apply the *Abercrombie* test no matter what. The successful challenges focus on provisions that are part of the corporation's internal governance. That includes internal governance provisions that appear in nominally external agreements, such as stockholder agreements (*Abercrombie*, *Marmon*, and *Schroder*), director agreements (*Abercrombie* and *Chapin*), rights plans (*Toll Brothers*, *Quickturn II*, and *UniSuper*), a management agreement (*Bally's*), an asset sale agreement (*Clarke*), a stock issuance agreement (*Field*), merger agreements (*Jackson, Nagy, ACE, QVC*, and *Omnicare*), and CEO employment agreements (*Grimes* and *Politan*). Two of the cases considered bylaws, which are inherently part of the corporation's internal governance arrangement (*AFSCME* and *Gorman*).

The Section 141(a) inquiry thus involves two elements. Initially, a court must determine whether the challenged provision is part of an internal governance arrangement. If not, then the inquiry ends. If so, then the court must apply the *Abercrombie* test to determine whether the provision imposes a restriction that violates Section 141(a).

### a. The First Step: Is The Challenged Provision Part Of A Governance Arrangement?

To reiterate, the Section 141(a) decisions consistently focus on internal governance arrangements. That makes sense given the role played by the DGCL.

> Delaware's corporation law is not what, in a European context, might be called a broad-based company law. Aspects of company law like competition law, labor law, trade, and requirements for the filing of regular disclosures to public investors, are not part of Delaware's corporation law. . . . Delaware corporation law governs only the internal affairs of the corporation. In that sense, our law is a specialized form of contract law that governs the relationship between corporate managers—the directors and officers—of corporations, and the stockholders.[235]

The DGCL governs the internal affairs of corporations, which are a reified form of autonomous property that exists by virtue of Delaware exercising its sovereign authority.[236] The Constitution of 1897 replaced the system of special chartering with a framework under which the Secretary of State can issue charters when applicants meet the DGCL's requirements.[237] It remains the case, however, that a Delaware corporation comes into existence and gains the power to act in the world by virtue of a sovereign act.[238] The DGCL defines what powers the corporation can exercise,

---

[235] Leo E. Strine, Jr., *The Delaware Way: How We Do Corporate Law and Some of the New Challenges We (and Europe) Face*, 30 Del. J. Corp. L. 673, 674 (2005).

[236] *See XRI Inv. Hldgs. LLC v. Holifield*, 283 A.3d 581, 651–52 (Del. Ch. 2022), *aff'd in part, rev'd on other grounds*, 304 A.3d 896 (Del. 2023).

[237] *See* Samuel Arsht, *A History of Delaware Corporate Law*, 1 Del. J. Corp. L. 1, 5–8 (1976) (discussing the Constitution of 1897 and the demise of the special chartering system).

[238] 8 *Del. C.* § 106 ("Upon the filing with the Secretary of State of the certificate of incorporation, executed and acknowledged in accordance with § 103 of this title, the incorporator or incorporators who signed the certificate, and such incorporator's or

including both general[239] and specific powers,[240] and a Delaware corporation only can wield the powers that the DGCL provides.[241] When a corporation purports to take an action that it lacks the capacity or power to accomplish, that action is *ultra vires* and void.[242]

Because the DGCL addresses internal affairs issues, Section 141(a) must address internal affairs issues. The internal-external distinction resembles the distinction between a corporation's exercise of its corporate power and the steps required for internal corporate actors to authorize the corporation's exercise of its corporate power.[243]

> Properly understood, the concept of corporate power refers to whether the entity has been granted the ability to engage in a given act. The

---

incorporators' successors and assigns, shall, from the date of such filing, be and constitute a body corporate, by the name set forth in the certificate, subject to § 103(d) of this title and subject to dissolution or other termination of its existence as provided in this chapter.").

[239] *See* 8 *Del. C.* § 121.

[240] *See* 8 *Del. C.* §§ 122–123.

[241] *Lawson v. Household Fin. Corp.*, 152 A. 723, 726 (Del. 1930); *accord Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. 518, 636 (1819) ("[A corporation] possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence.").

[242] *See Klaassen v. Allegro Dev. Corp.*, 2013 WL 5967028, at *16 (Del. Ch. Nov. 7, 2013) (discussing void acts; collecting authorities); *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5739680, at *15–19 (Del. Ch. Oct. 11, 2013) (same), *aff'd*, 106 A.3d 1035 (Del. 2014); *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 648–54 (Del. Ch. 2013) (same), *abrogated on other grounds by El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1264 (Del. 2016) (rejecting *Carsanaro*'s analysis of post-merger derivative standing). *See generally* C. Stephen Bigler & John Mark Zeberkiewicz, *Restoring Equity: Delaware's Legislative Cure for Defects in Stock Issuances and Other Corporate Acts,* 69 Bus. Law. 393, 394–401 (2014) (discussing voidness doctrine).

[243] *See Applied Energetics, Inc. v. Farley*, 239 A.3d 409, 439–41 (Del. Ch. 2020).

concept of authorization refers to whether the proper intra-corporate actors or combination of actors, such as the corporation's officers, directors, or stockholders, have taken the steps necessary to cause the corporation to take the given act.[244]

A contract represents the external exercise of corporate power. Section 141(a) polices internal restrictions on a board's ability to authorize a corporation to exercise its corporate power. Section 141(a) applies to external contracts that seek to implement internal restrictions.

---

[244] *Id.* at 439. The distinction between power and authorization has a lengthy pedigree. Questions about corporate power were an "oft-recurring theme" in the "formative years of corporation law in the 19th and early 20th centuries," when parties frequently invoked the *ultra vires* doctrine to challenge the validity of corporate action. 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 11.01, at 11-10 (2019 & Supp. 2022). The desire to preempt *ultra vires* challenges "led the old school of corporate draftsmen to include page after page of boiler-plate corporate powers in the 'purpose' sections of their certificates of incorporation." *Id.* This practice resulted in "[c]orporate charters of stultifying length and complexity," but without them, drafters feared that a corporate action could be held invalid on the theory that the corporation lacked the power to take it. *Id.* One of the goals of the major revision to the DGCL that took place in 1967 was to eliminate questions about corporate power by

> (i) removing from Section 102(b)(2) any requirements that a certificate of incorporation set out explicitly the specific business or purposes for which a corporation is organized, thereby removing the statutory requirement that charters set forth express or implicit limitations upon what business a corporation might pursue; (ii) eliminating from Section 121 all implications that the corporate powers and authority granted to Delaware corporations are strictly limited to those powers expressly granted by the statute or their certificates of incorporation; and (iii) abolishing through enactment of Section 124 whatever vestiges of the ultra vires doctrine may have remained with respect to the corporation's dealings with third parties . . . .

*Id.* § 11.01, at 11-1. These steps "have for virtually all intents and purposes obviated inquiries into whether or not Delaware corporations as a matter of their fundamental power or authority can undertake otherwise lawful acts." *Id. See generally Carsanaro*, 65 A.3d at, 648–54 (discussing *ultra vires* doctrine).

At this point, the Company interjects that drawing a distinction between internal governance arrangements and external commercial agreements is impossible. Citing *Sample*, the Company argues that all contracts are "doctrinally indistinguishable,"[245] meaning that to apply Section 141(a) to the Challenged Provisions would lead to the demise of contract law.[246]

Through this argument, the Company creates a soritical paradox.[247] Any contract imposes at least a grain's worth of restriction. The Challenged Provisions impose a heap of internal restrictions. The Company equates grains and heaps by contending that to invalidate the Challenged Provisions means no contract could be valid.

But is there really no way to distinguish grains from heaps? Humans in general, and legal professionals in particular, think in categories.[248] Categories are

---

[245] Def.'s Opening Br. at 4 ("[The plaintiff's] position conflicts with Delaware's deep contractarian jurisprudence, and ample case law confirming that Delaware companies do, and must be permitted to, contractually limit their field of managerial discretion by entering into enforceable agreements. If accepted, plaintiff's position would call into question—would essentially invalidate—thousands of stockholder and credit agreements that include doctrinally indistinguishable approval and director designation rights.").

[246] *Id.*

[247] *See, e.g.*, Dominic Hyde & Diana Raffman, *Sorites Paradox*, Stanford Encyclopedia of Philosophy (Mar. 26, 2018), https://plato.stanford.edu/entries/sorites-paradox/#EmbrPara ("[S]ince one grain of wheat does not make a heap, it follows that two grains do not; and if two do not, then three do not; and so on. This reasoning leads to the absurd conclusion that no number of grains of wheat make a heap.").

[248] *See, e.g.*, Claire A. Hill, *Beyond Mistakes: The Next Wave of Behavioural Law and Economics*, 29 Queen's L.J. 563, 573 (2004) ("My focus in this paper is on what may be the main way people make sense of the world and of themselves: the process of 'categorization'— putting things into categories."); Ronald Chen & Jon Hanson, *Categorically Biased: The*

based on prototypes, with penumbral cases that move progressively further away from the prototypes.[249] There are core cases where the category is clear and increasing fuzziness toward the periphery.[250] Take cars and SUVs. We can categorize vehicles based on those prototypes. At first, a Honda CR-V might be puzzling. As we see more crossover vehicles, we can create a new category around that prototype.

Judges and lawyers use the same process for legal reasoning.[251] Judges and lawyers examine precedent to find key characteristics, then reason from those precedents to apply the law to a new set of facts. The *Sheldon* case[252] illustrates this methodology. The Delaware Supreme Court identified one precedent that involved a prototypical control group.[253] The high court identified a second precedent that involved a prototype of parallel action.[254] The facts of *Sheldon* fell somewhere

---

*Influence of Knowledge Structures on Law and Legal Theory*, 77 S. Cal. L. Rev. 1103, 1131 (2004) ("Categories and schemas are critical building blocks of the human cognitive process. They allow humans to process or at least cope with the infinite amount of information in their environs. Categories and schemas influence every feature of human cognition, affecting not only what information receives attention, but also how that information is categorized, what inferences are drawn from it, and what is or is not remembered." (footnotes omitted)).

[249] Hill, *supra*, at 573–74.

[250] *Id.*

[251] *See* Edward H. Levi, *An Introduction to Legal Reasoning* 1–2 (1948).

[252] *Sheldon v. Pinto Tech. Ventures, L.P.*, 220 A.3d 245 (Del. 2019).

[253] *Id.* at 252 (citing *In re Hansen Med. Inc. S'holders Litig.*, 2018 WL 3025525, at *7 (Del. Ch. June 18, 2018)).

[254] *Id.* (citing *Van der Fluit v. Yates*, 2017 WL 5953514, at *6 (Del. Ch. Nov. 30, 2017)).

between the two. The justices compared and contrasted the facts of *Sheldon* with the prototypes to put the case in the proper category.[255]

Using prototypes and categories, courts can identify provisions that allocate authority among internal corporate actors and seek to constrain the board. Courts can distinguish those provisions from similar provisions in commercial agreements.

Contracts establishing governance arrangements have salient features that facilitate categorization. All are matters of degree. None are essential.

One factor is that governance agreements frequently have a statutory grounding in a section of the DGCL. Stockholder agreements are grounded in Section 218(c) and (d). Rights plans in Sections 151 and 157. Stock issuance agreements in Section 152. Merger agreements in Section 251. Asset sale agreements in Section 271. CEO employment agreements in Section 142. Bylaws are grounded in Section 109, and Delaware decisions treat then as a contract among intra-corporate actors.[256]

A second factor is that the corporation's counterparties in a governance agreement hold roles as intra-corporate actors. In a standard commercial contract, the counterparty might be a supplier, customer, or service provider. In a governance arrangement, the counterparties are likely to be officers, directors, stockholders, or their affiliates.

---

[255] *Id.* at 255–56.

[256] *Chevron*, 73 A.3d at 939.

A third factor is that the challenged provisions seek to specify the terms on which intra-corporate actors can authorize the corporation's exercise of its corporate power. They may require voting or not voting in a particular way (*Abercrombie* and *Chapin*),[257] or forbid particular actions that directors otherwise could take (*Marmon*, *Toll Brothers*, *Quickturn II*, and *Omnicare*).[258] Or they may limit the directors ability to act by forcing them to accept or await a determination by another actor (*Bally's*, *Clark, Field, Jackson, Nagy, ACE*, and *QVC*).[259]

A fourth factor is that, unlike a commercial contract, a governance agreement does not readily reveal an underlying commercial exchange. In a services agreement, supply agreement, or credit agreement, the contract reflects a clear exchange of consideration. With governance arrangements, the point is governance. That is not to say that the agreements are invalid because they lack a peppercorn of consideration. They plainly possess that. But the purpose of a governance arrangement is to allocate control rights. The decisions in *ACE*, *QVC*, and *Omnicare* were challenging and remain controversial because they involved provisions in transaction agreements that fell at the intersection of governance and commercial rights.

---

[257] *Chapin*, 402 A.2d at 1211; *Abercrombie*, 123 A.2d at 898.

[258] *Omnicare*, 818 A.2d at 925–26, 936; *Quickturn II*, 721 A.2d at 1287, 1291; *Marmon*, 2004 WL 936512, at *4–5; *Toll Bros.*, 723 A.2d at 1190–91.

[259] *QVC*, 637 A.2d at 39, 51; *Nagy*, 770 A.2d at 46, 60–62; *ACE*, 747 A.2d at 106; *Bally's*, 1997 WL 305803, at *5–6; *Jackson*, 1994 WL 174668, at *1, *4–5; *Clarke,* 257 A.2d at 240–41; *Field*, 68 A.2d at 818.

A fifth and related factor is the relationship between the contractual restrictions and a commercial purpose. In a commercial agreement, features that touch on governance seek to protect the underlying transaction. Credit agreements often contain negative covenants geared towards protecting the lender's right to be repaid. Transaction agreements often contain interim operating covenants to ensure that the buyer gets what it contracted to buy. In a commercial agreement, the bargain is the point and the governance rights protect the bargain. In a governance arrangement, the governance rights are the point.

A sixth and related factor is the presumptive remedy for breach. In a commercial agreement, the presumptive remedy will be damages tied to the commercial bargain. The damages remedy permits the breaching party to act, subject only to a contractual consequence. Injunctive relief can be available, but the party seeking the injunction must work to show irreparable harm. Governance arrangements, by contrast, involve control rights, so the presumptive remedy will be equitable relief enforcing the right. An action to enforce a governance arrangement is therefore likely to result in an order enjoining an intra-corporate actor from acting or compelling them to act. Rather than being able to act freely subject to a contractual consequence, the intra-corporate actor will not be free to act at all.

A final factor is duration of the contract and the corporation's ability to terminate it. A commercial agreement is more likely to be terminable or to have a limited duration. A governance arrangement is more likely to be enduring, even

indefinite. Either the corporation will lack the ability to terminate, or the right will be heavily constrained (*Bally's*, *ACE*, *QVC*, and *Omnicare*).[260]

Considering these factors when determining whether an agreement qualifies as a governance arrangement does not turn a facial challenge into an as-applied challenge. A facial challenge addresses a provision as it appears in a specific contract. The party making the facial challenge must prove that the provision, as it appears in a particular contract, cannot operate validly under Section 141(a).[261] In an as-applied challenge, by contrast, a court examines the decision to exercise a contractual right in the specific setting when it was exercised.[262] A court may still determine whether the challenged provision appears in a governance agreement, but the court also will focus on who did what, when, and how in the specific scenario at issue.

### b. The Second Step: Does The Challenged Provision Improperly Restrict The Board?

If the challenged provision appears in a contract that is part of the corporation's governance arrangement, then the court applies the *Abercrombie* test. At that point, the court must assess whether the provision "[has] the effect of removing from [the] directors in a very substantial way their duty to use their own best judgment on management matters" or "tends to limit in a substantial way the

---

[260] *Omnicare*, 818 A.2d at 925–26; *QVC,* 637 A.2d at 39; *ACE*, 747 A.2d at 106; *Bally's*, 1997 WL 305803, at *2, *6.

[261] *See Del. Bd. of Med. Licensure & Discipline v. Grossinger*, 224 A.3d 939, 956 (Del. 2020).

[262] *See id.*

freedom of director decisions on matters of management policy . . . ."[263] An agreement can have that effect directly or indirectly.

Section 141(a) decisions consistently invalidate direct board-level constraints. Provisions that expressly say that "the board" cannot take a particular action or must take particular action are invalid. Provisions that purport to bind individual directors are similarly invalid. Examples include *AFSCME*, *Quickturn II*, *Toll Brothers*, *Chapin*, *Schroeder*, and the *Abercrombie* decision's ruling on how the Voting Provision applied to Davies.[264]

Section 141(a) decisions have also invalidated direct company-level constraints. In *Bally's* and *ACE*, the board could exercise the company's right to terminate an agreement unless a lawyer opined that the action was required to fulfill the directors' fiduciary duties.[265] In *Field*, *Jackson*, and *Nagy*, the board could not set the amount of the transaction consideration because the contract charged another party with making that determination.[266] In *QVC* and *Omnicare*, the contract prevented the board from causing the company to terminate a merger agreement.[267]

---

[263] *Abercrombie*, 123 A.2d at 899; *accord Quickturn II*, 721 A.2d at 1292 & n.44; *Grimes II*, 673 A.2d at 1214; *see Mayer*, 141 A.2d at 461 (citing *Abercrombie* with approval); *Adams*, 121 A.2d at 305 (same).

[264] *AFSCME*, 953 A.2d at 238–40; *Quickturn II*, 721 A.2d at 1291–92; *Schroeder*, 2018 WL 11264517, at *4; *Toll Bros.*, 723 A.2d at 1190–92; *Chapin*, 402 A.2d at 1210–11; *Abercrombie*, 123 A.2d at 898.

[265] *ACE*, 747 A.2d at 106; *Bally's*, 1997 WL 305803, at *6.

[266] *Nagy*, 770 A.2d at 46; *Jackson*, 1994 WL 174668, at *1, *4–5; *Field*, 68 A.2d at 818.

[267] *Omnicare*, 818 A.2d at 939; *QVC,* 637 A.2d at 51.

Less frequently, Section 141(a) decisions invalidated indirect constraints. The *Abercrombie* decision held that the possibility of immediate removal operated as the equivalent of a direct restriction for the directors other than Davies.[268] The *Grimes* and *Politan* decisions considered whether the contractual consequences were so onerous that a board could not risk triggering them.[269]

Each of these categories only applies to governance agreements. Restrictions that appear in contracts that are not properly regarded as governance arrangements do not give rise to a Section 141(a) issue.

### c. The Role Of Stockholder Agreements

Under these standards, stockholder agreements are fertile ground for Section 141(a) violations. Section 218(c) of the DGCL authorizes "[a]n agreement between 2 or more stockholders, if in writing and signed by the parties thereto, may provide that in exercising any voting rights, the shares held by them shall be voted as provided by the agreement, or as the parties may agree, or as determined in accordance with a procedure agreed upon by them."[270] The DGCL thus expressly authorizes stockholders to enter into agreements about how they will exercise their voting rights. The statute also states that its terms "shall not be deemed to invalidate any voting

---

[268] *Abercrombie*, 123 A.2d at 899.

[269] *Grimes II*, 673 A.2d at 1215; *Politan*, C.A. No. 2022-0948-NAC, at 173–91.

[270] 8 *Del. C.* § 218(c).

or other agreement among stockholders . . . ."[271] The statute does not greenlight governance provisions that appear in stockholder agreements rather than in the charter.[272]

Once parties to a stockholder agreement start addressing governance issues, they can easily move beyond agreements about allocating rights appurtenant to their shares and transition to internal governance issues. To the extent the agreement purports to allocate authority among or impose restraints on intra-corporate actors, it is part of the internal entity contract and subject to Section 141(a). A court must therefore analyze the specific provisions.

Stockholder agreements are also challenging because they can accomplish both more and less than other components of the corporate hierarchy. In one sense, stockholder agreements can accomplish *more* because "when stockholders enter into agreements about how they will exercise stockholder-level rights, . . . [the] individual

---

[271] 8 *Del. C.* § 218(d).

[272] Section 218 is quite the bare-bones provision. The expansive use of stockholder agreements suggests that greater statutory guidance may be beneficial. The General Assembly has acted previously to address uncertainty about questions involving restrictions on board power. Section 146 helpfully answers whether a board can bind itself contractually to take a matter to a stockholder vote even if the directors have concluded that they no longer support an affirmative stockholder vote on the issue. *See* 8 *Del. C.* § 146. Before the enactment of Section 146, Section 251(c) included similarly helpful language addressing the board's authority to commit contractually to take a merger to a stockholder vote if the board no longer regarded the merger as advisable. *See* 8 *Del. C.* § 251(c) (2002). And as noted, Section 113 helpfully addresses issues related to proxy expense reimbursement, including questions that were the subject of *AFSCME*. *See* 8 *Del. C.* § 113. And earlier amendments to Sections 152(c) and 251(b) addressed the extent to which stock issuances and merger agreements could be made dependent on facts ascertainable outside the agreement. *See* 8 *Del. C.* §§ 152(c) & 251(b). This decision has tried to apply Section 141(a) to the Challenged Provisions. Its author would welcome additional statutory guidance.

owners are bargaining over their private property."[273] To that end, the DGCL authorizes stockholders to agree to greater constraints on their fundamental rights to sell and vote in a stockholder agreement—than a corporation can impose in its charter or bylaws.[274]

In another sense, however, stockholder agreements cannot achieve as much as higher components in the corporate hierarchy, and stockholder agreements often fall short when parties try. "A share of stock represents a bundle of rights defined by the laws of the chartering state and the corporation's certificate of incorporation and bylaws."[275] Under the corporate hierarchy, the DGCL, the charter, and the bylaws establish the rights that stockholders possess.[276] If the stockholder-level agreement binds the stockholders as to how they exercise those rights, then there is no conflict

---

[273] *New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 570 (Del. Ch. 2023).

[274] *Id.* at 570–71; *accord Rohe*, 2000 WL 1038190, at *16 n.49 ("[S]tockholders can bind themselves contractually in a stockholders agreement in a manner that cannot be permissibly accomplished through a certificate of incorporation."); *Chapin*, 402 A.2d at 1209 ("A stockholder has an ownership interest in his shares. To the extent that he contracts away the rights deriving from that interest, it is his prerogative to do so."). *Compare Bonanno v. VTB Hldgs., Inc.*, 2016 WL 614412, at *16 (Del. Ch. Feb. 8, 2016) (enforcing forum-selection provision in stockholder agreement that required litigation of internal affairs claims in New York), *and Baker v. Impact Hldgs., Inc.*, 2010 WL 1931032, at *4 (Del. Ch. May 13, 2010) (enforcing forum-selection provision in stockholder agreement that required litigation of internal affairs claims in Texas), *with* 8 *Del. C.* § 115 (authorizing the charter or bylaws to provide for exclusive jurisdiction in the courts of the State of Delaware for internal corporate claims; providing that charter and bylaws cannot prohibit bringing internal corporate claims in the courts of the State of Delaware).

[275] *Bamford v. Penfold, L.P.*, 2020 WL 967942, at *23 (Del. Ch. Feb. 28, 2020)

[276] *New Enter. Assocs.*, 295 A.3d at 573.

with any higher component.[277] But if a stockholder agreement purports to alter or ignore the structure that the higher-level components created, then the effort is ineffective, and the higher-level component prevails.[278] Similarly, if a stockholder agreement attempts to alter an internal governance structure that either the DGCL mandates or which can only be altered through the charter or bylaws, then the attempt will be ineffective.[279]

These principles point to a simple test for determining when a provision in a stockholder agreement is not subject to Section 141(a): Does the contractual provision address an action that a stockholder individually or a group of stockholders collectively could take? If yes, then a stockholder can contract over that action in advance, without risking any violation of the corporate hierarchy. The stockholder gets to choose whether to exercise those rights and can agree contractually to constrain its exercise of those rights.

If a stockholder agreement tries to do more, than the corporate hierarchy and Section 141(a) may invalidate the attempt. "[S]tockholders of a corporation subject to the DGCL may not directly manage the business and affairs of the corporation, at least without specific authorization in either the statute or the certificate of

---

[277] *Id.*

[278] *Id.*

[279] *Id.*

incorporation."[280] A provision in a stockholder agreement that purports to enable stockholders to manage the business and affairs of a corporation is invalid.

**B.    The Challenged Provisions Are Part Of An Internal Governance Arrangement.**

For reasons already discussed, the Section 141(a) inquiry starts by asking whether the challenged provisions are part of an internal governance arrangement as opposed to an external commercial agreement. On that spectrum, the Challenged Provisions fall on the governance side of the line.

First, a governance arrangement generally is tied to a section of the DGCL and a role in regulating the corporation's internal affairs. Here, the Challenged Provisions appear in the Stockholder Agreement, which is grounded in Section 218 of the DGCL. The Stockholder Agreement self-evidently regulates the Company's internal affairs. It was part of Moelis' effort to reorganize his business for life as a public corporation. That effort included creating the Company, inserting bespoke provisions into the Charter, and adopting a set of bylaws (the "Bylaws") that reflected those arrangements. Not surprisingly, the Challenged Provisions look like the type of governance arrangements that would appear in a charter or a certificate of designations as rights appurtenant to preferred stock. Versions of the Challenged Provisions could have gone in the Charter. Moelis simply put them in the Stockholder Agreement.

---

[280] *AFSCME*, 953 A.2d at 232.

Second, a governance arrangement generally involves intra-corporate actors. Here, all of the Company's counterparties are intra-corporate actors. The *only* parties to the Stockholder Agreement are the Company, Moelis, and three of his affiliates. Moelis is the Company's founder, CEO, and Chairman. In substance, the Stockholder Agreement is a bilateral agreement between the Company and Moelis.

Third, the Challenged Provisions attempt to govern how internal corporate actors authorize the exercise of corporate power. The Pre-Approval Requirements constrain Board action. The Board Composition Provisions and the Committee Composition Provision mandate Board or Company action. Except for the Nomination Requirement and the Efforts Requirement, all of the Challenged Provisions purport to bind the Board.

Fourth, there is no evident underlying commercial bargain. When asked about the consideration the Company received, all its lawyers could cite is Moelis' employment agreement and the conditions embodied in the Secondary Class B Condition.[281] Moelis' employment agreement is a separate contract altogether, and the conditions embodied in the Secondary Class B Condition are just that— conditions, not obligations. That is not to say that the Stockholder Agreement is invalid for lack of consideration. At least a peppercorn of consideration exists. The point is that there is no evident underlying deal that led the Company to grant Moelis

---

[281] Def.'s Reply Br. at 24–25.

the extensive rights he received. That is because the purpose of the Stockholder Agreement is to allocate control rights to Moelis.

Fifth, because there is no underlying commercial arrangement, the governance features in the Stockholder Agreement are not tied to one. Unlike in *Sample*, where the Equity Capital Restriction could play a rational role in protecting the buyer's interests in purchasing a large block of stock, the Challenged Provisions establish a web of governance rights and constraints.

Sixth, the Board lacks any ability to terminate the Stockholder Agreement. Section 5.1 of the Stockholder Agreement governs termination. It states:

> The terms of this Agreement shall terminate, and be of no further force and effect:
>
> (a) upon the mutual consent of all of the parties hereto;
>
> (b) with respect to Holdings, if the Secondary Class B Condition ceases to be satisfied; or
>
> (c) with respect to each Stockholder (other than Holdings), at such time after the Secondary Class B Condition ceases to be satisfied that such Stockholder and its Permitted Transferees who are Stockholders cease to Beneficially Own a Registrable Amount.[282]

Any non-consensual termination thus depends on the failure of the Secondary Class B Condition.

The elements of the Secondary Class B Condition only include one item nominally within the Board's control: If Moelis' employment agreement is "terminated in accordance with its terms because of a breach of his covenant to devote

---

[282] SA § 5.1 (formatting added).

his primary business time and effort to the business and affairs of the Company and its subsidiaries or because he suffered an Incapacity."[283] But even that item is not truly in the Board's control. Whether Moelis devotes his primary business time and effort to the business and affairs of the Company is up to Moelis. Whether Moelis suffers an Incapacity is up to the Fates.[284]

Not only that, but terminating Moelis is also one of the items where a pre-approval requirement exists. The Stockholder Agreement states that even after the failure of the Class B Condition, as long as the Secondary Class B Condition is satisfied,

> the Board shall not authorize, approve or ratify any of the following actions or any plan with respect thereto without the prior approval (which approval may be in the form of an action by written consent) of [Moelis]:

> (i) any removal or appointment of the Chief Executive Officer of the Company . . . .[285]

The Stockholder Agreement thus specifically contemplates that the Board cannot remove Moelis as CEO without his pre-approval while the Secondary Class B Condition is met, which means as long as the Stockholder Agreement exists. The

---

[283] *Id.* at 6.

[284] The Stockholder Agreement defines "Incapacity" as "with respect to Mr. Moelis, the entry of an order of incompetence or of insanity, or permanent physical incapacity or death." *Id.* at 3.

[285] *Id.* § 2.1(b).

Board thus has no path to terminate the Stockholder Agreement unilaterally unless the Secondary Class B Condition fails of its own accord.

The Board also has no path to terminate the Pre-Approval Requirements by causing the Class B Condition to fail. As with the Secondary Class B Condition, the only source of failure nominally in the Board's control would be to terminate Moelis' employment agreement. How much time and effort Moelis devotes to the Company is up to him, and whether he suffers an Incapacity is not up to the Board. And under the Pre-Approval Requirements, the Board must obtain Moelis' prior approval for "any removal or appointment of any officer of the Company that is, or would be, subject to Section 16 of the Exchange Act[.]"[286] As CEO, Moelis is a Section 16 officer, so his pre-approval is required for his own termination.

At oral argument, Company counsel suggested that no one intended to require Moelis' pre-approval for his own termination and that the specific language of the employment agreement that allows for its termination should control over the general language in the Stockholder Agreement that requires his pre-approval for the termination of Section 16 officers.[287] But the Stockholder Agreement specifically preserves Moelis' termination as one of the acts that continues to require his pre-approval even after the Class B Condition fails. That is not a more general provision; it is quite specific. The pre-approval requirement for terminating a Section 16 officer

[286] SA § 2.1(a)(vii).

[287] Def.'s Reply Br. at 26 n.3; Tr. at 45–46, 68–70.

is also quite specific. Plus, it would not make sense if the Company could not terminate Moelis after his ownership fell below the level required to satisfy the Series B Condition, but could terminate him without his consent before the Series B Condition failed, when he had greater ownership and more detailed rights. When the employment agreement and the Stockholder Agreement are read together, the Board must obtain Moelis' pre-approval under the Stockholder Agreement before exercising any rights the Company has under the employment agreement.

That means the Board has no ability to navigate its way out of the thicket of restrictions imposed by the Stockholder Agreement. That suggests that the purpose of the arrangement is to ensure that Moelis retains control over the Company's internal affairs.

Last, a successful action to enforce the Challenged Provisions would likely result in equitable relief, such as an injunction forcing the Board or the Company to act or not act. Because the Challenged Provisions are not tied to an underlying commercial arrangement, it would be difficult for a court to construct a damages remedy for breach. The Challenged Provisions are designed to compel or prevent action, through judicial enforcement if necessary.

The Challenged Provisions serve an obvious purpose. They were included to preserve Moelis' control, even if he sold enough shares that his voting power dropped below a mathematical majority, as it now has. As long as he controlled a majority of the outstanding voting power, Moelis could elect all of the directors. After he sold down, the Board Composition Provisions would ensure that Moelis could still elect a

100

majority of the Board. And he can continue to do so as long as the Class B Condition is met, which currently allows him to control a majority of the board with beneficial ownership of around 7% of the Class A shares. The Committee Composition Provision ensures that Moelis' designees will comprise a majority of any committee. There can be no wholly independent committees who might take action against Moelis unless Moelis approves its creation.

The Pre-Approval Requirements serve a similar purpose. As long as Moelis held a majority of the outstanding voting power, he could remove the entire Board without cause through action by written consent. That power gave him the practical ability to check any plan the Board might pursue. As he sold down, that power would dissipate. The Pre-Approval Requirements ensure that the Board must continue to obtain Moelis' pre-approval after Moelis no longer has a majority of the voting power, as long as the Class B Condition is met. The Pre-Approval Requirements also enhance Moelis' power as a controller. By requiring the Board to get his approval first for a vast swathe of actions, Moelis avoids the potentially explosive implications of removing directors.

The Challenged Provisions are prototypical governance provisions in a prototypical governance agreement. As such, they are part of the Company's internal governance arrangement. Even though they appear in a separate contract, they are subject to Section 141(a).

## C.    The Facial Challenge To The Pre-Approval Requirements

Because the Pre-Approval Requirements are part of a governance arrangement, they are subject to the *Abercrombie* test. The plaintiffs challenge the

101

Pre-Approval Requirements as a whole. The plaintiffs also challenge the requirements individually. This decision need not reach the individual challenges. Taken as a whole, the Pre-Approval Requirements go too far. They facially violate Section 141(a).

## 1. The Pre-Approval Requirements Restrict The Board.

Under *Abercrombie*, governance restrictions violate Section 141(a) when they "have the effect of removing from directors in a very substantial way their duty to use their own best judgment on management matters" or "tend[] to limit in a substantial way the freedom of director decisions on matters of management policy . . . ."[288] The Pre-Approval Requirements are explicit and direct limitations on the Board's ability to take action. The pertinent provisions do not impose obligations or restrictions on the Company, with the Company potentially answerable in damages for breach. The provisions purport to bind and constrain the Board. The introductory language states: "So long as the Class B Condition is satisfied, *the Board* shall not authorize, approve or ratify any of the following actions or any plan with respect thereto without the prior approval (which approval may be in the form of an action by written consent) of [Moelis]."[289] The Pre-Approval Requirements are direct, board-level constraints.[290]

---

[288] *Abercrombie*, 123 A.2d at 899.

[289] SA § 2.1(a) (emphasis added).

[290] From a purely technical perspective, only the Company is a party to the Stockholder Agreement, not the Board. That is necessarily true, because the corporation is the jural person, not the board, and the corporation has the power to contract. Except in rare circumstances where directors attempt to bind themselves (like the trustees in *Chapin* or the

The Company responds that the Pre-Approval Requirements are just "consent rights."[291] The Company then argues that the "consent rights" do not constrain the Board because they do not dictate any director's vote, leaving the directors "free to vote for, or against, any corporate action consistent with their own business judgment."[292] The Company also argues that the Pre-Approval Requirements do not actually constrain the board unless exercised, and the Company says they never have been.[293] Those arguments fail for a series of reasons.

For starters, the Pre-Approval Requirements are not framed as consent rights. They are framed as prohibitions. They identify actions that the Board *cannot take* unless Moelis gives his approval, in writing, in advance. This is not a setting where "under certain conditions, certain corporate actions cannot be implemented unless

---

lone director (Davies) in *Abercrombie*) a corporation generally will be the formal counterparty. But that does not eliminate the Section 141(a) issue. At most, it merely calls for analyzing the provisions as corporate-level restrictions, and a direct, corporate-level restriction in a governance agreement can violate Section 141(a). The decisions in *Quickturn II*, *Toll Brothers, Marmon, Schroeder*, *Bally's, Field, Jackson, Nagy, ACE, QVC,* and *Omnicare* show that the corporation's status as the nominal counterparty does not alter the inquiry.

[291] *See* Tr. 60 ("[The Pre-Approval Requirements] are consent rights, they are negative rights, they have not taken the board off the field."); Defs.' Opening Br., at 33 ("[The Pre-Approval Requirements do] not delegate any board authority to [Moelis] because it in no way allows [Moelis] to exercise board authority in respect of a particular corporate action. . . . Section 2.1 thus nowhere confers or delegates board power upon [Moelis]. Rather, [the Pre-Approval Requirements] provide[] that, under certain conditions, certain corporate actions cannot be implemented unless they have been approved by *both* the board and [Moelis].").

[292] Def.'s Opening Br. at 21.

[293] *Id.* at 29.

they have been approved by *both* the board and [Moelis],” as the Company argues.[294] The Board literally cannot take any of the listed actions or approve “any plan with respect thereto” unless Moelis gives his “prior approval.”[295] The Pre-Approval Requirements impose a flat ban on these categories of actions unless Moelis allows them. They make Moelis the gatekeeper to board action.

Assuming that the Company’s mischaracterization was accurate and that the Pre-Approval Requirements were framed as consent rights, that would not make a difference. A flat prohibition that a counterparty can waive is the mirror image of a requirement to obtain counterparty consent. Both are contractual blocks that the counterparty can decide to enforce. In each case, the right gives another party the ability to prevent action. Both are equally constraining.

The real question is whether a right to prevent the Board from taking action constrains the Board’s authority. The answer would seem obvious, but the Company insists it is not. The Company argues that the Board can do whatever it wants, it’s just that sometimes Moelis may disagree. One might as easily tell an inmate in a prison that she is free to do anything she wants, it’s just that sometimes a prison guard might disagree.

---

[294] *Id.* at 33.

[295] SA § 2.1(a).

In the real world, "the power to review is the power to decide."[296] "If every decision of A is to be reviewed by B, then all we have really is a shift in the locus of authority from A to B."[297] If another party (be it a court, the stockholders, or a contractual counterparty) can review board decisions and change them or impose consequences, "then the directors' power of fiat would become merely advisory rather than authoritative."[298] Authority ultimately rests with the reviewing party, not the front-line decider.[299]

The Company argues that unless the plaintiff can point to a present negative or detrimental effect on the Company or its stockholders, then relief must be denied. The ability of humans to anticipate constraint results in a present, negative, and detrimental effect. Just as presidential veto power and the policy goals of the Oval

---

[296] Stephen M. Bainbridge, *Director Primacy in Corporate Takeovers: Preliminary Reflections*, 55 Stan. L. Rev. 791, 815 (2002).

[297] Kenneth J. Arrow, *The Limits of Organization* 78 (1974); *accord* Stephen M. Bainbridge, *Director Primacy in Corporate Takeovers: Preliminary Reflections*, 55 Stan. L. Rev. 791, 815 (2002).; Michael P. Dooley & E. Norman Veasey, *The Role of the Board in Derivative Litigation: Delaware Law and the Current ALI Proposals Compared*, 44 Bus. Law. 503, 522 (1989) ("The power to hold to account is the power to interfere and, ultimately, the power to decide. If stockholders are given too easy access to courts, the effect is to transfer decisionmaking power from the board to the stockholders . . . . By limiting judicial review of board decisions, the business judgment rule preserves the statutory scheme of centralizing authority in the board of directors.").

[298] Stephen M. Bainbridge, *Director Primacy: The Means and Ends of Corporate Governance*, 97 Nw. U. L. Rev. 547, 573 (2003).

[299] Or at least that is true when the reviewing party has expansive discretion to block or reverse the actions of the front-line decider. Narrower grants of authority to the reviewing party have less effect. For example, "[t]he right to fire is not the right to exercise fiat—it is only the right to discipline." Stephen M. Bainbridge, *Director v. Shareholder Primacy in the Convergence Debate*, 16 Transnat'l Law. 45, 49 (2002)

Office shape what Congress views as possible and the bills that end up on the Resolute Desk, so too will the existence of the Pre-Approval Requirements shape the Board's sense of the possible and what the directors pursue. The Board and Moelis must interact regularly. Moelis does not just hold the Pre-Approval Requirements. He is the Company's CEO, Chairman, and eponymous founder—perhaps the most powerful triad of positions in a company. Doubtless Moelis has preferences. If the directors anticipate that Moelis will not pre-approve a course of action, then they may never suggest it in the first place. If push came to shove on a major issue that threatened the directors' reputations, livelihoods, or wealth, then they could be expected to take a stand. Short of that, and particularly on issues where reasonable minds can disagree, accommodation is the easier course.[300]

In an effort to blunt the significance of the Pre-Approval Requirements, the Company represents that Moelis has never exercised them, but that does not defeat the plaintiff's facial challenge. Instead, that is powerful evidence that the Pre-Approval Requirements have a chilling effect. The Stockholder Agreement has been

---

[300] Consider a hypothetical scenario in which a controller holds contract rights paralleling the Pre-Approval Requirements and wants the bound corporation to hire one of his children as a C-suite officer. Assume the child is minimally qualified, but that directors unconstrained in their freedom of action would hire a more experienced candidate. Knowing that the controller must pre-approve any hire, and understanding the controller's desires, would the directors undertake a search process against the controller's wishes or risk creating a deadlock over whether to appoint the child? Doubtless there are strong boards that would go toe-to-toe with the controller. Doubtless there are others that would not. What particular directors do in a particular situation presents a question of fiduciary breach under the second prong of Professor Berle's twice-tested rubric. When the existence of a contractual constraint on core board action appears outside of the charter and produces the dilemma, then there is a Section 141(a) problem under the first prong of Professor Berle's twice-tested rubric.

in place for a decade. Think of the myriad issues that the Company has confronted over those years. Yet Moelis and the Board have never disagreed?

The best deterrents are never used. Knowing the deterrent exists, those who are deterred don't test the limits. Happily, the Cold War ended without to United States or its adversary launching a nuclear weapon. The fact that our presidents never used the Gold Codes does not mean that our nuclear triad had no effect. Quite the opposite.

In addition to operating as constraints in the real world, the Pre-Approval Requirements qualify as constraints under Delaware law. In *Abercrombie*, the agents' agreement did not literally bind the director designees of the corporate stockholders to vote as seven out of eight agents agreed or an arbitrator determined. Instead, the corporate stockholders bound themselves to

> use their best efforts to cause their representatives on the Board of Directors . . . to vote . . . as determined by the Agents or by any seven thereof, and that in the event of the failure of any such director so to vote all parties hereto will cooperate and act in any legal manner possible to cause any director voting contrary to any such determination by the Agents to resign or be removed and to be replaced upon the Board of Directors . . . .[301]

Nevertheless, this provision was invalid as to the other directors "[b]ecause it tends to limit in a substantial way the freedom of director decisions on matters of management policy" and therefore prevents each director from being able "to exercise

---

[301] *Abercrombie*, 123 A.2d at 606.

his own best judgment on matters coming before the board."[302] Chancellor Seitz also noted that a director might feel bound to honor a decision even though it was contrary to his own best judgment.[303]

The same is true here. In fact, the Pre-Approval Requirements are more pernicious than the Voting Provision in *Abercrombie*, because they expressly require Moelis' prior approval before the Board can act. In *Abercrombie*, the directors other than Davies only faced the threat of removal after the fact.

The Pre-Approval Requirements are so all-encompassing as to render the Board an advisory body. Moelis, not the Company, is running the show. The directors can only act to the extent Moelis lets them. The Pre-Approval Requirements have the effect of removing from the directors in a very substantial way their duty to use their own best judgment on virtually every management matter. They are therefore facially invalid under the *Abercrombie* test.

### 2. The Pre-Approval Requirements Cannot Operate Legitimately.

The Company also contends that the plaintiff's facial challenge fails because Pre-Approval Requirements can operate legitimately. According to the Company, so long as Moelis does not invoke them, there is no Section 141(a) problem.

That argument fails initially because it ignores the deterrent effect of the Pre-Approval Requirements. As discussed in the prior section, the Pre-Approval

---

[302] *Id.* at 610.

[303] *Id.*

Requirements loom in the background, forcing the directors to operate at all times in their shadow. The existence of the Pre-Approval Requirements always and necessarily inhibits the exercise of board power.

Setting aside the deterrent effect, the Company argues that the provisions do not formally constrain the Board as long as Moelis and the directors agree. But from that formalistic standpoint, agreement makes Pre-Approval Requirements superfluous. There is no need to enforce contractual restrictions when the counterparty is already doing what you want. The only setting when Moelis would need to enforce one of the Pre-Approval Requirements is if the Board was committed to taking action that Moelis rejected. In every setting where Moelis enforces one of the Pre-Approval Requirements, the provision will operate invalidly to constrain the Board. There is never a time that Moelis could enforce a Pre-Approval Requirement and not have it constitute a Section 141(a) violation.

A similar dynamic existed in *AFSCME*, where stockholders sought to adopt a bylaw that would require the board to reimburse proxy contest expenses under specific settings. If the board decided to reimburse the expenses on its own initiative, then the proposed bylaw was superfluous. The bylaw only operated to force board action in a setting where the board had decided that the proxy expenses should not

be reimbursed.[304] The bylaw therefore could not operate validly and was contrary to Delaware law.[305]

There is no setting in which the Pre-Approval Requirements can operate validly. The facial challenge to the Pre-Approval Requirements therefore succeeds.

## D. The Facial Challenge To The Board Composition Provisions

The plaintiff next mounts a facial challenge to the Board Composition Provisions, which seek to constrain the size and composition of the Board. The Board Composition Provisions are therefore part of a governance arrangement to which Section 141(a) applies.

There are six Board Composition Provisions: the Size Requirement, the Designation Right, the Nomination Requirement, the Recommendation Requirement, the Efforts Requirement, and the Vacancy Requirement. The Recommendation Requirement, the Vacancy Requirement, and the Size Requirement violate the *Abercrombie* test, cannot operate legitimately, and are facially invalid. The Designation Right, the Nomination Requirement, and the Efforts Requirement can operate legitimately and so are not facially invalid.

### 1. The Recommendation Requirement

The Recommendation Requirement is the easiest to address. It mandates that the Board recommend in favor of Moelis' designees, whoever they might be, by

---

[304] *AFSCME*, 953 A.2d at 239–40.

[305] *Id.*

110

requiring that the Company include Moelis' designees "in the slate of nominees recommended by the Board."[306] That obligation is facially invalid.

Delaware law on mandating board recommendations is well developed due to disputes over provisions that have attempted to prevent a board from changing its recommendation in favor of a merger.[307] Section 251(b) provides that "[t]he board of directors of each corporation which desires to merge or consolidate shall adopt a resolution approving an agreement of merger or consolidation and declaring its advisability."[308] This single sentence imposes two separate statutory obligations. First, the board must "approv[e] [the] agreement of merger." Second, the board must "declar[e] its advisability." The board's declaration of advisability is typically referred to as the board's merger recommendation, although Section 251 does not use that phrase.[309]

Under Section 251(c), after board approval, the merger agreement must be submitted to stockholders "for the purpose of acting on the agreement."[310] The board's recommendation is material information that must be disclosed to the

---

[306] SA § 4.1(c).

[307] *See generally In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 494–96 (Del. Ch. May 10, 2013).

[308] 8 *Del. C.* § 251(b).

[309] *See* 8 *Del. C.* § 251; Steven M. Haas, *Limiting Change of Merger Recommendations to "Intervening Events,"* 13 No. 8 M&A Law. 15, 20 n.1 (Sept. 2009).

[310] 8 *Del. C.* § 251(c).

111

stockholders.[311] A board has an ongoing obligation to review and update its recommendation.[312] The duty includes "an obligation to use reasonable care in presenting a recommendation for stockholder action and in gathering and disseminating corporate information in connection with that recommendation."[313]

"Delaware law requires that a board of directors give a meaningful, current recommendation to stockholders regarding the advisability of a merger including, if necessary, recommending against the merger as a result of subsequent events."[314] This obligation flows from the bedrock principle that "when directors communicate publicly or directly with shareholders about corporate matters, the *sine qua non* of directors' fiduciary duty to shareholders is honesty."[315] The duty of loyalty, which mandates that directors act in stockholders' best interests, consequently "requires

---

[311] *Van Gorkom*, 488 A.2d at 888 (explaining that a board cannot "delegate to the stockholders the unadvised decision as to whether to accept or reject the merger"); Allen, *supra*, at 658 (noting that the disclosure of a current merger recommendation is encompassed within "the board's fiduciary obligation of candor"); Haas, *supra*, at 15 ("The board's merger recommendation is also part of its broader fiduciary duties to stockholders . . . . [which] include a duty of disclosure.").

[312] *See Frontier Oil Corp. v. Holly Corp.*, 2005 WL 1039027, at *28 (Del. Ch. Apr. 29, 2005) ("Revisiting the commitment to recommend the Merger was not merely something that the Merger Agreement allowed the [Target] Board to do; it was the duty of the [Target] Board to review the transaction to confirm that a favorable recommendation would continue to be consistent with its fiduciary duties.").

[313] Lawrence A. Hamermesh, *Calling Off the Lynch Mob: The Corporate Director's Fiduciary Disclosure Duty*, 49 Vand. L. Rev. 1087, 1163 (1996).

[314] Balotti & Sparks, *supra*, at 476.

[315] *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998).

ensuring an informed stockholder vote."[316] "A board may not suggest or imply that it is recommending the merger to the shareholders if in fact its members have concluded privately that the deal is not now in the best interest of the shareholders."[317]

In light of these principles, "[t]he target board must have an ability to make a truthful and candid recommendation consistent with its fiduciary duties—and this duty will be applicable whether or not there is a superior offer."[318] A target board may not "tie its hands . . . [and] agree to recommend the existing agreement even when, because of changed circumstances, it believes the existing agreement is not, at the time of its recommendation, in the stockholders' best interests."[319]

These principles apply equally to a board recommendation regarding director candidates. A board cannot recommend individuals whom it does not subjectively believe should be directors, and it cannot continue to recommend individuals whom it recommended previously if it no longer recommends them.

The Recommendation Requirement mandates that the Board recommend Moelis' designees, regardless of what the directors think about them. That obligation

---

[316] Haas, *supra*, at 15 (citing *In re Berkshire Realty Co., Inc.*, 2002 WL 31888345, at *4 (Del. Ch. Dec. 18, 2002) ("[I]f the board, in the exercise of its business judgment, determined that liquidation was not in the best interests of . . . its stockholders, it could not have recommended a liquidation without violating its fiduciary duty to the stockholders.")).

[317] Allen, *supra*, at 658.

[318] John F. Johnston, *A Rubeophobic Delaware Counsel Marks Up Fiduciary-Out Forms: Part I*, 13 Insights: The Corp. & Sec. L. Advisor, No. 10, 2, 5 (Nov. 1999).

[319] John F. Johnston, *A Rubeophobic Delaware Counsel Marks Up Fiduciary–Out Forms: Part II*, 14 Insights: The Corp. & Sec. L. Advisor, No. 2, 16, 19 (Feb. 2000).

violates the *Abercrombie* test by removing from the directors in a very substantial way their duty to use their own best judgment on a management matter, *viz.*, who should serve as a director.

As with the Pre-Approval Requirements, the Recommendation Requirement cannot operate permissibly. If the Board already supports Moelis' designees, then the Recommendation Requirement is not doing any work. The Recommendation Requirement does work when the Board opposes one or more of Moelis' designees. Thus, in every setting where the Recommendation Requirement operates, it violates Section 141(a). The Recommendation Requirement is facially invalid.

### 2. The Vacancy Requirement

The Vacancy Requirement is the next easiest to address. That obligation is facially invalid as well.

Article FIFTH, Part (5) of the Charter gives the board the exclusive power to fill vacancies. It states:

> Subject to the terms of any one or more classes or series of Preferred Stock, any vacancy on the Board of Directors that results from an increase in the number of directors may be filled only by a majority of the Board of Directors then in office, provided that a quorum is present, and any other vacancy occurring on the Board of Directors may be filled only by a majority of the Board of Directors then in office, even if less than a quorum, or by a sole remaining director.[320]

---

[320] Charter, art. 5, pt. 5.

Article FIFTH, Part (6) makes clear that even if Moelis creates a vacancy, only a majority of the directors then in office can fill it. The relevant portion of that provision states:

> [A]t any time the Class B Condition is satisfied, any or all of the directors of the Corporation may be removed from office at any time, with or without cause, by the affirmative vote of the holders of a majority of the voting power of the shares entitled to vote in connection with the election of the directors of the Corporation. *The vacancy or vacancies in the Board of Directors caused by any such removal shall be filled as provided in Clause (5) of* this *Article FIFTH.*[321]

The Bylaws say the same thing about vacancies, albeit without the reference to the possibility of directors elected by particular classes or series of preferred stock.[322]

Under these provisions, only the Board can fill vacancies. The power to fill a vacancy includes the power to select the person to fill it. Yet through the Vacancy Requirement, the Board cannot use its own judgment for a vacancy if the seat was formerly occupied by a Moelis designee. The Board must appoint another Moelis designee.

The Vacancy Requirement violates the *Abercrombie* test by removing from the directors in a very substantial way their duty to use their own best judgment on a management matter, *viz.*, who should serve as a director. The *Chapin* decision is

---

[321] Charter, art. 5, pt. 6 (emphasis added).

[322] Bylaws § 3.2 ("Unless otherwise required by law or the Certificate of Incorporation, any vacancy on the Board of Directors that results from an increase in the number of directors may be filled only by a majority of the Board of Directors then in office, provided that a quorum is present, and any other vacancy occurring on the Board of Directors may be filled only by a majority of the Board of Directors then in office, even if less than a quorum, or by the sole remaining director.").

directly on point.[323] The only difference between the succession agreement in *Chapin* and the Vacancy Restriction is that the trustees agreed on specific people to fill vacancies as they arose. Under the Vacancy Requirement, the directors have agreed to accept a person whom Moelis designates. The limitation on the Board's power under Section 141(a) is the same.

As with the Recommendation Requirement, the Vacancy Requirement only operates when Moelis and the Board disagree on who should fill a vacancy. Any board can choose to fill a vacancy with a candidate whom the CEO and Chairman suggests. If the Board decides voluntarily to fill a vacancy with someone Moelis proposes, then the Vacancy Requirement is not compelling the directors to act. The Vacancy Requirement only has teeth if the Board disagrees. In every setting where the Vacancy Requirement operates, it violates Section 141(a), making it facially invalid.

### 3. The Size Requirement

The Size Requirement mandates that the Company use its best efforts to maintain a Board with not more than eleven seats, unless Moelis approves a different number. At present, that provision cannot operate at all, but that does not mean that it can operate validly. In any setting when the Size Requirement could be invoked, it would be facially invalid.

---

[323] *Chapin*, 402 A.2d at 1210 (holding that directors of a non-stock corporation (who were called trustees) could not bind themselves in advance to name designated persons to fill vacancies on the board of trustees); *id.* at 1211 (holding that trustees needed to be free to use "their best judgment in filling a vacancy on the board of trustees as of the time the need arises"); *see* Part II.A.1.a.iii, *supra* (discussing *Chapin*).

116

Section 141(b) of the DGCL addresses the topic of board size. The statute provides that either the bylaws must identify the number of seats comprising the whole board, or the charter must specify a procedure for making that determination.[324]

The Charter establishes a lower and upper bound for the size of the Board and empowers the Board to determine its size by resolution within those parameters. Article FIFTH, Part (3) states: "The Board of Directors shall consist of not less than three (3) nor more than eleven (11) members, the exact number of which shall be fixed from time to time by resolution adopted by the affirmative vote of a majority of the Board of Directors then in office."[325]

The Bylaws echo the Charter on this point. Section 3.1(a) of the Bylaws states: "The Board of Directors shall consist of not less than three (3) nor more than eleven (11) members, the exact number of which shall be fixed initially by the Incorporator and thereafter from time to time by the Board of Directors."[326]

The Size Requirement obligates the Company to use its best efforts "to cause to be elected to the Board, and to cause to continue in office, not more than eleven (11) directors (or such other number of directors as [Moelis] may agree to in writing)." Under this provision, there can be fewer than eleven directors in office, but there

---

[324] 8 *Del. C.* § 141(b).

[325] Charter, art. 5, pt. 3.

[326] Bylaws § 3.1(a).

cannot be "more than eleven (11) directors (or such other number of directors as [Moelis] may agree to in writing)." The Size Requirement thus establishes a ceiling of eleven seats that the Board cannot exceed without Moelis's consent.

At present, the Size Requirement is doing nothing because the Charter and Bylaws prevent the Board from having more than eleven seats. Because the Board is already constrained by those statutorily valid provisions, the Board cannot act to increase the number of seats beyond eleven. The Size Requirement is currently superfluous.

But that does not mean that the Size Requirement is not facially invalid. The Size Requirement can only become operative if the Charter and Bylaws were amended to authorize the Board to have more than eleven seats. At that point, the Size Requirement would violate the *Abercrombie* test by removing from the directors in a very substantial way their duty to use their own best judgment on a management matter, *viz.*, the size of the Board. The *Chapin* decision would be on point and establish that the provision was invalid.[327]

As with the Recommendation Requirement and the Vacancy Requirement, there is no setting where Moelis could invoke the Size Requirement and have it operated validly. The only time it can operate is if (i) the Charter and Bylaws allow more than eleven directors, and (ii) the directors want to expand the Board to have

---

[327] *Chapin*, 402 A.2d at 1210–11 (holding that directors of a non-stock corporation (who were called trustees) could not bind themselves by agreement to maintain a board size of four members when the governing documents permitted a range of three to five); *see* Part II.A.1.a.iii, *supra* (discussing *Chapin*).

more than eleven seats. Only in that setting does the Size Requirement kick in, and in that setting, it operates invalidly to constrain the Board's authority under Section 141(a). It is therefore facially invalid.

### 4. The Designation Right

The Designation Right enables Moelis to specify individuals as potential candidates for election as director. As long as the Class B Condition is met, Moelis can specify a number of individuals equal to a majority of the seats on the Board. After the Class B Condition fails, Moelis can specify a number of individuals equal to one quarter of the seats on the Board. That provision is not facially invalid.

The Designation Right, standing alone, only gives Moelis the ability to propose a specific number of designees. It does not force the Board or the Company to do anything with the designees. The other Board Composition Provisions determine what, if anything, the Board and the Company have to do with Moelis' designees.

Viewed in isolation, the Designation Right does not impose any restriction on the Board that could violate Section 141(a). It is not invalid.

### 5. The Nomination Requirement

The Nomination Requirement obligates the Company to include the Moelis designees in the Company's slate of nominees by "nominating such designees to be elected as directors."[328] That provision is not facially invalid.

---

[328] SA § 4.1(c).

Nominating a candidate means enabling them to stand for election. Recommending a candidate means endorsing their candidacy.

The ability to nominate candidates is an important stockholder right. "The right of shareholders to participate in the voting process includes the right to nominate an opposing slate."[329]

> The unadorned right to cast a ballot in a contest for corporate office is meaningless without the right to participate in selecting the contestants. As the nominating process circumscribes the range of choice to be made, it is a fundamental and outcome-determinative step in the election of officeholders. To allow for voting while maintaining a closed selection process thus renders the former an empty exercise.[330]

Only the board can give its recommendation to a slate of candidates. Nominating candidates, by contrast, is not a power that the board holds exclusively. Stockholders have the right to nominate candidates as well.

Because stockholders have the right to nominate candidates, they can legitimately bargain with the corporation over the exercise of that right. The bargains they extract could interfere with the board's prerogatives under Section 141(a), but a company can agree to nominate candidates that a stockholder proposes without violating Section 141(a). Although there might be situations in which an as-applied challenge could succeed, the Nomination Requirement is not facially invalid.

---

[329] *Linton v. Everett*, 1997 WL 441189, at *9 (Del. Ch. July 31, 1997); *accord Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *5 (Del. Ch. Jan. 14, 1991).

[330] *Harrah's Ent., Inc. v. JCC Hldg. Co.*, 802 A.2d 294, 311 (Del. Ch. 2002) (quoting *Durkin v. Nat'l Bank of Olyphant*, 772 F.2d 55, 59 (3d Cir. 1985) (cleaned up)).

### 6. The Efforts Requirement

The Efforts Requirement derives from two provisions in the Governance Agreement. Section 4.1(a) obligates the Company to take "all reasonable actions within [its] respective control . . . so as to cause [Moelis' designees] to be elected to the Board, and to cause to continue in office."[331] Section 4.1(c) obligates the Company to "use its reasonable best efforts to cause the election of each such designee to the Board."[332] The Efforts Requirement is not facially invalid.

The Efforts Requirement can legitimately obligate the Company to take ministerial steps to ensure that stockholders can consider Moelis' nominees and potentially elect them, such as by adding Moelis' designees to the Company's proxy card or by including information about them in the Company's proxy statement. Even in a situation where the Board opposed the election of a Moelis designee, those actions would not constitute a meaningful infringement on the Board's authority under Section 141(a). There might be situations when an as-applied challenge to the Efforts Requirement could succeed, but the existence of scenarios in which the Efforts Requirement could operate legitimately is sufficient to defeat a facial challenge.

### E. The Facial Challenge To The Committee Composition Provision

Finally, the plaintiff mounts a facial challenge to the Committee Composition Provision. That provision is invalid under Section 141(a) and Section 141(c)(2).

---

[331] SA § 4.1(a).

[332] SA § 4.1(c).

Section 141(c)(2) empowers the board to determine the composition of committees. It states:

> The board of directors may designate 1 or more committees, each committee to consist of 1 or more of the directors of the corporation. The board may designate 1 or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.[333]

In plain terms, that section empowers the board to create committees and select the members who will serve on those committees.

The Bylaws confirm that this rule applies to the Company. Section 3.10 states:

> The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation. Each member of a committee must meet the requirements for membership, if any, imposed by applicable law and the rules and regulations of any securities exchange or quotation system on which the securities of the Corporation are listed or quoted for trading. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meetings of such committee.

The bylaw provision envisions that the Board both establishes a committee and designates its members.

The Committee Composition Provision violates the *Abercrombie* test by removing from the directors in a very substantial way their duty to use their own best judgment on a management matter, *viz.*, who should serve on a committee. Under Sections 141(a) and (c) and in accordance with the Bylaws, the Board has the power to determine who sits on a committee. By requiring that the Board include a

---

[333] 8 *Del. C.* § 141(c)(2).

proportionate number of Moelis designees on each committee, the Committee Composition Provision forces the Board to exercise its discretion in a particular way. Without Moelis' consent, the Board cannot create a committee that excludes Moelis' designees. The Board also cannot create a committee that includes a lesser number of Moelis' designees than would be proportionate to the number on the Board.

The Company responds by arguing that to "designate" a committee does not involve appointing its members. The able law firm representing the Company previously reached the opposite conclusion. When asked to address the validity of a bylaw provision that would allow a single director to determine the members of committees, the Company's counsel had no difficulty concluding that designating a committee meant selecting its members:

> Although Section 141(c)(2) does not define what it means to "designate" a committee, a court construing this provision would accord the term its plain meaning. *See Sostre v. Swift*, 603 A.2d 809, 813 (Del. 1992). The plain meaning of "designate" is to select one or more persons to perform a specific duty, i.e., to serve on a committee of the board of directors. *See* Black's Law Dictionary, at 447 (6th ed. 1990) (defining the word "designate" to mean "to indicate, select, appoint, nominate, or set apart for a purpose or duty, as to designate an officer for a command. To mark out and make known; to point; to name; indicate").[334]

In the same letter, the law firm opined that the proposed bylaw was statutorily invalid:

> Beyond contravening the express terms of Section 141(c)(2), allowing a single director to appoint the members of a board committee would undermine the implicit policy rationale of the statute. Section 141(c)(2)'s requirement that the members of a board committee be designated by the board of directors (or a properly authorized committee of the board)

---

[334] PX 13 at 4 n.3.

is vital to the statutory scheme enabling the use of board committees because it bridges the gap between the use of board committees, which permits board action by select directors, and the general policy that, "to be valid, actions of a board must be taken at a meeting where all members are afforded the opportunity to be present" and "participate fully in the deliberations." 1 David Drexler et al., Delaware Corporation Law and Practice § 13.01[6], at 13-11 (2007). By operation of Section 141(c)(2)'s requirements, the entire board has the opportunity to participate in establishing the board committee and selecting its members (or in selecting the members of a committee that, in turn, may appoint directors to other board committees). Enabling a single director to appoint the members of a board committee without providing an opportunity for input or participation by the remaining directors essentially substitutes the single director's decision for the entire board, thereby subverting the very mechanism that validates the use of board committees.[335]

That reasoning applies to the Committee Composition Provision.

As with the other facially invalid requirements, the Committee Composition Provision cannot operate legitimately. If the Board voluntarily populates a committee with a proportionate number of Moelis' designees, then the provision is not doing any work. The Committee Composition Provision only comes into play when Moelis and the Board disagree, at which point the provision prevents the Board from exercising its statutory authority. The Committee Composition Provision is therefore facially invalid.

## F.    The Policy Arguments

To defend the Challenged Provisions, the Company advances a series of policy arguments. This case does not call for a public policy analysis. When the General

---

[335] *Id.* at 4–5.

124

Assembly has enacted a statute, that statute embodies Delaware's public policy.[336] A court is not free to disregard it.

First, the Company suggests that Delaware cases have upheld similar provisions, creating a reliance interest. Citing *Sample*, the Company argues that "this Court has held that contractual approval rights such as those conferred by [the Pre-Approval Requirements] are facially valid under [Section] 141(a)."[337] That is not true. The *Sample* decision only considered the Equity Capital Restriction, not a comprehensive suite of provisions like the Pre-Approval Requirements. The Equity Capital Restriction provision appeared in a third-party commercial agreement, not an internal governance agreement. And *Sample* is only one decision. The contemporary canon of Section 141(a) cases contains more than a dozen decisions that have invalidated contractual constraints in governance agreements under Section 141(a).

The Company also cites decisions involving stockholder agreements that contained features similar to the Challenged Provisions.[338] The Company observes that those decisions have not held the provisions invalid. That is because no one challenged them. It would be an extreme step for a court to declare a provision invalid

---

[336] *See XRI*, 283 A.3d at 651 ("[P]ublic policy may be determined from consideration of the federal and state constitutions, the laws, the decisions of the courts, and the course of administration." (quoting *Sann v. Renal Care Ctrs. Corp.*, 1995 WL 161458, at *5 (Del. Super. Mar. 28, 1995)).

[337] Def.'s Opening Br. at 22.

[338] *Id.* at 23 & n.3 (collecting cases).

when no one has challenged it. Those decisions do not speak to the validity of the provisions.[339]

Next, the Company argues that many companies have stockholder agreements containing similar provisions. The Company also points out that settlement agreements resolving proxy contests with activist investors often contain provisions resembling the Board Composition Provisions.

This case does not involve an activist settlement agreement. Any Section 141(a) challenge to a provision in an activist settlement agreement would depend on what the provision said. A provision that resembled the Designation Right, the Nomination Requirement, or the Efforts Requirement would likely pass muster. A provision that resembled the Recommendation Requirement, the Vacancy Requirement, or the Size Requirement could be problematic, particularly if, as here, the provisions purported to bind directors irrespective of future events. But any Section 141(a) assessment of provisions in an activist settlement agreement must await an appropriate case.

The Company is correct that other corporations have entered into similar stockholder agreements with favored internal actors. To date, the number of

---

[339] Some of the cases are distinguishable on other grounds as well. For example, *Fletcher International Ltd. v. Ion Geophysical Co.*, 2013 WL 6327997 (Del. Ch. Dec. 4, 2013), involved a series of agreements to purchase preferred stock. *Id.* at *2. The consent right over the issuance of any security by a wholly owned subsidiary was not in the commercial agreement, but in the certificate of designations for the preferred stock. *Id.* And *Urdan v. WR Capital. Partners, LLC*, 2019 WL 3891720 (Del. Ch. Aug. 19, 2019), and *Next Level Communications, Inc. v. Motorola, Inc.*, 834 A.2d 828 (Del. Ch. 2003), involved loan or credit agreements (i.e., commercial agreements).

companies using this structure remains low relative to the total number of companies in the market. Ruling on the validity of these provisions now will not be overly disruptive, particularly when statutorily permissible alternatives exist. Instead, addressing the issue now is important because Professor Rauterberg has uncovered a trend. Corporate planners have increasingly turned to stockholder agreements as a means of allowing favored stockholders to maintain control, even at levels where their stock ownership would not support a control finding.[340] A standard strategy involves baking in a stockholder agreement containing governance rights when setting up a company for an IPO. That enables the pre-IPO stockholders who are parties to the agreement to sell down over time, while relying on the stockholder agreement to maintain control. If that strategy violates Section 141(a), then it would be good for corporate planners to know that sooner, rather than later, so they can deploy alternative structures.

In any event, market practice is not law. Delaware courts consider market practice, because market practice can reflect the judgments of experienced counsel about what is possible under Delaware law. But corporate lawyers are marvelous mimics. And clients pay corporate lawyers to push the envelope. When the General Assembly has enacted a statute, a court's job is to enforce the statute, even if that has implications for market practice.[341]

---

[340] Rauterberg, *supra*, at 1148–54.

[341] To reiterate, this is an area where the guardians of the DGCL could provide clarity by building out Section 218 to specify what stockholder agreements can accomplish. Section

As its ace in the hole, the Company appeals to private ordering. According to the Company, the court should uphold the Challenged Provisions because of "Delaware's general commitment to safeguarding 'freedom of contract' and its 'policy of enforcing the voluntary agreements of sophisticated parties in commerce.'"[342] Even private ordering has its limits. "Corporate law, unlike contract law, is not susceptible to near-infinite customization."[343]

As the Delaware Supreme Court recently reiterated, "[o]nly a strong showing that dishonoring [a] contract is required to vindicate a public policy interest even stronger than freedom of contract will induce our courts to ignore unambiguous contractual undertakings."[344] Section 141(a) embodies just such a policy interest. It imposes Delaware's board-centric governance model on every corporation, "except as may be otherwise provided in this chapter or in its certificate of incorporation."[345] Delaware law permits and even encourages private ordering. But when restricting the board's authority, the tailoring must take place in the charter.

---

218 primarily addresses voting trusts, which are largely a thing of the past. *See* 8 *Del. C.* §§ 218(a) & (b). If the General Assembly enacted a statute addressing what stockholder agreements can achieve, then that statute would control because any authorized departure from board-centrism would be "as may be otherwise provided in this chapter." 8 *Del. C.* § 141(a).

[342] Def.'s Opening Br. at 26–27 (quoting *Terrell* v. *Kiromic Biopharma, Inc.*, 2023 WL 3237142, at *7 (Del. May 4, 2023)).

[343] Fisch, *Stealth Governance, supra*, at 943.

[344] *Cantor Fitzgerald, L.P. v. Ainslie*, ---A.3d ---, 2024 WL 315193, at *1 (Del. Jan. 29, 2024) (internal quotations omitted).

[345] 8 *Del. C.* § 141(a).

The General Assembly's policy choice on this point is a rational one. Stockholders should be able to contract freely about how they will exercise their stockholder level rights.[346] But to the extent stockholder agreements seek to impose governance constraints on the board, as new-wave agreements often do, then private ordering must take place through the charter. As Professor Fisch has explained, forcing private ordering into a corporation's constitutive documents "restores the legislative and judicial roles in determining the permissible scope of private ordering," rather than opening the door to an "anything goes" model based on private contracts.[347] It also ensures greater visibility and transparency regarding the governance solutions that corporations reach.[348] Professor Fisch concludes that "the use of formal governance tools facilitates the transparency of governance innovation, leads to clarification of the law, and permits the spread of provisions that have the potential to enhance corporate value."[349]

Through Section 141(a), the General Assembly has established a zone of protection for board-level power, subject only to charter-based limitations. The Section 141(a) precedents show that the statutory restriction on board-level

---

[346] *New Enter. Assocs.*, 295 A.3d at 570 ("Delaware's commitment to contractarianism should be at its height when stockholders enter into agreements about how they will exercise stockholder-level rights, because at that level, individual owners are bargaining over their private property.").

[347] Fisch, *Stealth Governance*, *supra*, at 955.

[348] *Id.* at 956.

[349] *Id.*

constraints is not a doctrine that only stockholder plaintiffs deploy. Yes, many of the judicial opinions involve stockholders challenging provisions, as in this case. But a significant minority of decisions involve corporations arguing that restrictions were invalid.[350] And outside of court, distinguished law firms regularly rely on Section 141(a) to defeat stockholder efforts to introduce mandatory proposals or enact bylaws that would constrain the board.[351] Section 141(a) is not a one-way doctrine. It plays an important role in protecting the board's prerogatives against intrusions from outside of the charter, irrespective of their source.

The Company's approach would eliminate the mediating role that Section 141(a) plays in favor of a regime where corporations could eat their cake and still have it. Corporations could continue to invoke Section 141(a) to disregard mandatory stockholder proposals and bylaws that stockholders as a whole might enact, yet they would be able to bypass Section 141(a)'s constraints to provide governance rights to favored stockholders by contract. Section 141(a) should protect board primacy against encroachment from all sides. The Section 141(a) canon has gotten that right.

The fact that there may be statutorily compliant methods to achieve many of the same results does not mean that the Challenged Provisions get a free pass. "When

---

[350] *See AFSCME*, 953 A.2d at 230; *Gorman*, 2015 WL 4719681, at *4; *UniSuper*, 2005 WL 3529317, at *6.; *ACE*, 747 A.2d at 106; *Chapin*, 402 A.2d at 1210–11.

[351] *See* PX 10, 11, 13.

evaluating claimed violations of the DGCL, Delaware law takes a formal and technical approach."[352]

> [T]he entire field of corporation law has largely to do with formality. Corporations come into existence and are accorded their characteristics, including most importantly limited liability, because of formal acts. Formality has significant utility for business planners and investors. While the essential fiduciary analysis component of corporation law is not formal but substantive, the utility offered by formality in the analysis of our statutes has been a central feature of Delaware corporation law.[353]

Thus, Delaware courts, "when called upon to construe the technical and carefully drafted provisions of our statutory corporation law, do so with a sensitivity to the importance of the predictability of that law. That sensitivity causes our law, in that setting, to reflect an enhanced respect for the literal statutory language."[354]

If the plaintiff had brought an equitable challenge, then the existence of an alternative path could be significant, because "equity regards substance rather than form."[355] When considering statutory compliance, formality matters. The doctrine of independent legal significance might well mean that Moelis can still secure many of the rights he sought, but he must follow a statutorily authorized route.

---

[352] *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 201 (Del. Ch. 2014).

[353] *Uni–Marts, Inc. v. Stein,* 1996 WL 466961, at *9 (Del. Ch. Aug. 12, 1996) (Allen, C.).

[354] *Speiser v. Baker*, 525 A.2d 1001, 1008 (Del. Ch. 1987) (Allen, C.), *appeal refused*, 525 A.2d 582 (Del. 1987) (TABLE).

[355] *Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 737 (Del. 1983).

### III.    CONCLUSION

When market practice meets a statute, the statute prevails. Market participants must conform their conduct to legal requirements, not the other way around. Of course, the General Assembly could enact a provision stating what stockholder agreements can do. Unless and until it does, the statute controls.

The plaintiff's motion for summary judgment is granted as to the facial invalidity of the Pre-Approval Requirements, the Recommendation Requirement, the Vacancy Requirement, and the Size Requirement. The Company's motion for summary judgment is granted as to the facial validity of the Designation Right, the Nomination Requirement, and the Efforts Requirement. The motions are otherwise denied.

Within ten days, the parties will submit a joint letter that attaches an agreed-upon form of order implementing the rulings made in this decision and in the Timing Decision. If the parties cannot agree, they will submit a joint letter outlining their disagreements and proposing a path for resolving them.

132